# United States Court of Appeals
## For the First Circuit

No. 23-1463

ADRIANNA WADSWORTH,

Plaintiff, Appellant,

v.

CHUCK NGUYEN, MSAD 40/RSU 40, and ANDREW CAVANAUGH,

Defendants, Appellees,

MEDOMAK VALLEY HIGH SCHOOL,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Montecalvo, Lynch, and Rikelman, Circuit Judges.

John J. Wall, III, with whom Monaghan Leahy, LLP, was on brief, for appellant.
Eric R. LeBlanc, with whom Zachary H. Hammond and Bennett & Belfort, P.C., were on brief, for appellee.
Sean Ouellette, Mollie Berkowitz, Adele P. Kimmel, and Public Justice were on brief for amicus curiae Public Justice.

February 19, 2025

**MONTECALVO, <u>Circuit Judge</u>**. Plaintiff-appellant Adrianna Wadsworth, who was a student at Medomak Valley High School ("Medomak") during the relevant time period, initiated this lawsuit against Andrew Cavanaugh, the principal at the time in question; Chuck Nguyen, a school social worker; and the school district, MSAD 40/RSU 40 ("MSAD"). In her operative complaint, Wadsworth alleged various constitutional claims against Cavanaugh, Nguyen, and MSAD, as well as a Title IX claim against MSAD.[1] Before us now are several decisions from the district court: one on a motion to dismiss and three on motions for summary judgment.[2] In those decisions, the district court determined that Wadsworth's constitutional claims and Title IX claim could not survive, and Wadsworth now appeals. For the reasons that follow, we affirm the district court decision on the motion to dismiss, affirm in part and reverse in part the summary judgment decision in favor of Cavanaugh, affirm the summary judgment decision in favor of Nguyen, and affirm in part and reverse in part the summary judgment decision in favor of MSAD.

---

[1] Wadsworth also alleged a variety of tort claims against the three defendants. Those claims are not at issue in this appeal.

[2] This appeal was initiated as a cross-appeal to case number 23-1400. The cases were briefed and argued together; however, an opinion in that case issued separately. See <u>Wadsworth</u> v. <u>Nguyen</u>, No. 23-1400, 2024 WL 4766994 (1st Cir. Nov. 13, 2024) (dismissing for failure to establish appellate jurisdiction) (per curiam).

## I. Background

### A. Facts

We begin by setting forth the relevant facts. Because this case arises mainly from the district court's entry of summary judgment in favor of various defendants, "we take the facts in the light most favorable to [Wadsworth] and draw all reasonable inferences therefrom in [her] favor." Universal Trading & Inv. Co. v. Bureau for Representing Ukrainian Ints. in Int'l & Foreign Cts., 87 F.4th 62, 65-66 (1st Cir. 2023).

Medomak is a school within MSAD, which Stephen Nolan has led as superintendent since 2014. As superintendent, Nolan directly supervises the Medomak principal and has the "power to initiate an investigation into a principal's conduct, impose discipline short of dismissal, and recommend that the School Board dismiss a principal." Cavanaugh was the principal of Medomak from 2015 until his resignation in December of 2017. As principal, Cavanaugh directly supervised the school's assistant principals, positions held, during the relevant time, by Linda Pease and Tamra Philbrook. Also during the relevant time, Nguyen was a social worker at Medomak.

Wadsworth started as a student at Medomak in 2014, just before Cavanaugh was promoted to principal. In the spring of 2016, when Wadsworth was a sixteen-year-old sophomore, she was caught drinking alcohol at a party and, as a result, had to meet with

Principal Cavanaugh. Prior to that meeting, Cavanaugh's interactions with Wadsworth had been limited to giving her awards for "being a good student." During that meeting or thereabouts, Wadsworth informed Cavanaugh about issues she was having at home. Specifically, Wadsworth reported "numerous issues with her mother."[3]

Concerned that Wadsworth was at risk of leaving her home, Principal Cavanaugh referred her to Nguyen. As a result, Wadsworth met with Nguyen several times that year and, as the school year came to a close, Wadsworth met with Cavanaugh a few times a week. At some point, Principal "Cavanaugh asked [Wadsworth] if there was some way that he could help [her] escape from the house, try to get away from the house," he then told Wadsworth that "he had a few jobs . . . that would get [her] away from the house . . . and that's when [he and Wadsworth] exchanged [cellphone] numbers." That summer, with her mother's approval, Wadsworth helped Principal Cavanaugh with odd jobs, including cleaning his rental properties and babysitting his nephew. While spending this time together, their relationship became less formal, and Principal Cavanaugh's involvement in Wadsworth's school and home life steadily increased.

---

[3] Wadsworth's childhood was marked by a "very challenging" home life due to her parents' turbulent relationship. Her parents fought often, and domestic violence incidents resulted in child protective services' involvement with the family.

At the start of her junior year, Wadsworth decided to move out of her mother's house. She wanted to do so, at least in part, because her parents frequently fought and because she wanted to be more actively involved in MSAD student life, something her mother discouraged. Wadsworth then moved in with a friend's family (the "Kenniston family"). Cavanaugh and Nguyen were both informed of Wadsworth's new living arrangement and met with the Kenniston parents, Theresa and Darren.

Shortly after Wadsworth moved, she was no longer able to use her mother's car and told her father that she needed a replacement. Wadsworth also told Principal Cavanaugh about this, and he purchased a car for her, paying the $ 3,000 price with the expectation that Wadsworth would work for him to pay off half of the cost. Wadsworth's father was aware of this situation and gave Cavanaugh permission to purchase the car. The car was registered in Cavanaugh's name, and Cavanaugh maintained car insurance.

During her junior year, Wadsworth wanted to participate in cheerleading and needed a physical examination in order to do so. Principal Cavanaugh offered to, and did, take Wadsworth to the doctor to complete the physical. Principal Cavanaugh also suggested multiple times that Wadsworth consider asking for prescription birth control. Although Wadsworth had explained that she was not interested, Principal Cavanaugh continued to suggest birth control, explaining that it could be a potential solution

for the menstruation issues Wadsworth had previously mentioned to him. He also raised Wadsworth's "menstruation issues" with her doctor.

At some point, Wadsworth got a prescription for birth control, but the parties dispute whether Cavanaugh had any involvement in the process to get the prescription. However, throughout their relationship, Principal Cavanaugh repeatedly suggested that Wadsworth get a prescription for birth control and asked detailed questions about her menstrual cycle and whether she was using the birth control prescription.

During this time, Principal Cavanaugh gave Wadsworth money for various personal essentials (i.e., shampoo, conditioner, soap, a toothbrush, toothpaste, various feminine hygiene products, and a winter coat) and for school lunch. He also gave her money for nonessentials such as getting her hair and nails done for prom. He paid for Wadsworth's school pictures and prom tickets and offered to cover the cost of her SAT test. It was not unusual for Medomak teachers and administrators to provide some aid to students in need.

Principal Cavanaugh also encouraged Wadsworth to move in with him and his wife,[4] bringing up the possibility multiple times.

---

[4] In his briefing, Cavanaugh consistently uses the term "wife" but on at least one occasion specifies "common-law wife." He also testified that his first and only marriage ended prior to the

Over the course of May and June 2017, Cavanaugh sent Wadsworth text messages on at least eight occasions encouraging her to come stay with him -- once remarking "[I] am going to have to order you to live at my house" -- but Wadsworth either did not directly respond or provided a vague answer, deferring the decision to some point in the future. However, Cavanaugh eventually informed Wadsworth that it was not a possibility, texting her: "I spoke with work about you staying with me[,] and [I] can[']t."

In Wadsworth's junior year, during which she turned seventeen, and into the start of her senior year, Principal Cavanaugh met with Wadsworth frequently -- multiple times a week -- sometimes during Wadsworth's classes and during her free periods. When Principal Cavanaugh pulled Wadsworth from classes, those meetings were recorded because Cavanaugh had to affirmatively excuse Wadsworth from class, and during her junior year, Wadsworth met with Cavanaugh during class hours at least eight times. But in October 2017, Cavanaugh asked the attendance secretary "to stop entering his name in the comments if he excused or dismissed [Wadsworth] as . . . teachers didn't like it and he was getting grief for it." Further, one of Wadsworth's peers testified that "[a]lmost every day" Cavanaugh would come into Wadsworth's study hall and talk to her, sometimes pulling her out

---

events in question. Despite this discrepancy, we follow his lead and use the term "wife."

of study hall to meet. That student went on to explain that Wadsworth "complained that she was missing out on study hall time" as a result.

Principal Cavanaugh and Wadsworth also communicated extensively via text message. From April to November 2017, Cavanaugh and Wadsworth exchanged numerous, near-daily text messages. During that eight-month period, the two exchanged more than 4,800 text messages, communicating at all hours of the day and night.

Cavanaugh regularly initiated these text message conversations and often, if Wadsworth did not respond quickly, would send additional questions until she responded. He regularly cited a "three[-]minute response rule," which he expected Wadsworth to follow when he sent her a message and once explained that she should "feel guilty" for not responding to his messages. At times when Wadsworth did not respond promptly, Principal Cavanaugh would threaten physical violence. For example, Cavanaugh wrote: "Are you looking to get knocked?"; "You must be"; and "Don't challenge me woman. I would hit you so hard, you would starve to death before you quit rolling." He also wrote, "I bet if I slapped you a couple times you would be mine forever." Another time, after approximately three hours had passed with no response from Wadsworth, Cavanaugh sent another series of messages: "Way past the three[-]minute response rule!"; "Did you die?"; and "If

it didn't sound creepy [I] might threaten you with a spanking." On another occasion, he wrote "I might have to give you a spanking."

Many of these text messages revolved around Wadsworth's school work, college applications, and home life. Wadsworth confided in Principal Cavanaugh about her struggles with her parents, her health, her confidence, and a sexual assault she had experienced. Cavanaugh often played the role of confidant, providing sympathy and words of advice in these messages. However, he also initiated conversations about sex and made comments about Wadsworth's appearance.

Specifically, Principal Cavanaugh regularly inquired into Wadsworth's dating and sex life. On at least two occasions, he asked her if she had experienced "the 'O' yet," likely referring to whether Wadsworth had ever experienced an orgasm, and proceeded to provide a vague explanation as to how she could, including that she "just need[ed] some practice" and "should try [her]self and then it w[ould] be easier for [her]." He also asked if she had "ever been with a girl." And, on several occasions, Cavanaugh asked Wadsworth to tell him her "scandalous" "secrets." And, in addition to inquiring into Wadsworth's romantic life, Principal Cavanaugh alluded to his own romantic prowess, writing things like "Can you see now how I am so irresistible?" and "Girl, you know I got game!"

Principal Cavanaugh also sent messages containing sexual innuendos. For example, he implied he wanted to see Wadsworth perform a "topless cheerleading routine." On another occasion, Cavanaugh wrote: "You are like a daughter to me. . . . a scandalous stepdaughter. Hah hah." He also suggested that Wadsworth could be an erotic dancer, writing "10-4 princess" and explaining that "10-4" was "the height of the pole [she] ha[d] to dance on."

Principal Cavanaugh also inquired about whether Wadsworth might send him pictures of herself in a swimsuit and remarked on times he had seen her in a swimsuit. He once asked to see what Wadsworth described as "scandalous" photos, telling her to "[o]nly send [him] the scandolous [sic] ones!" In the same conversation, he referred to Wadsworth as "the sports illustrated swimsuit model." On another occasion, Cavanaugh asked Wadsworth if she had ever sent "nude" pictures to anyone, later explaining that "some of our boys" have "pictures of some of our girls," and that "both the boys and girls are people in [Wadsworth's] circle."

In the text messages, Cavanaugh often made remarks about Wadsworth's appearance, particularly her attractiveness. For example, Principal Cavanaugh wrote: "Of course you have a pretty big rack but that's because of the [birth control] pill" and then "[w]ell[] you[r breasts] make me a little dizzy!" In another set of text messages he stated, "I know you are super hot and that probably does influence me . . ." He also remarked: "You are just

too hot for your own good!" And, in response to Wadsworth writing "I just flirt with you and get what I want," Cavanaugh wrote, "Pretty much[,] I was always a sucker for a smokin['] chick[.]" He also explained that "it would be hatd [sic] for [Wadsworth] to not look sexy" and once referred to her as "a snappy little vixen." And, on many occasions, Cavanaugh sent her admonitions to not "get fat."

In the text messages, Principal Cavanaugh referred to Wadsworth as "princess," "cupcake," and "lady time" (the latter also being a reference to Wadsworth's menstrual cycle). He also referred to her as a "ho," which is generally understood as slang for "whore." On another occasion he referred to her as a "bitch." Once, Cavanaugh referred to Wadsworth as a "skank," colloquially understood to mean a woman of low moral character. At no point did the relationship ever become physical.

During this time, Assistant Principals Pease and Philbrook had some understanding of the nature of Principal Cavanaugh's relationship with Wadsworth.[5] Both were aware of the frequent meetings between Cavanaugh and Wadsworth and the fact that several teachers had expressed concern with how often the two

---

[5] Wadsworth also alleges that Nguyen was well aware of Principal Cavanaugh's conduct and that he told Wadsworth that Cavanaugh was acting in her best interests. Additional details of Wadsworth's allegations against Nguyen are set forth in Part III.B.1 infra.

met as it caused Wadsworth to miss class. Although it was not unusual for the principal to meet regularly with students, Assistant Principal Philbrook had concerns about when those meetings were happening and told him that "she had some concerns about the number of times [he was] taking . . . Wadsworth out of class." Cavanaugh's explanation for the meetings was that "Wadsworth was dealing with a difficult family situation and needed support." The assistant principals were also aware that Cavanaugh referred to Wadsworth as "cupcake," that she was working for him, that he wanted to invite her to live with him, and that they communicated by text message (there is nothing in the record, however, to suggest that they were aware of the content and extent of the text messages). At no point did either assistant principal bring anything to the attention of the superintendent.

The fall of 2017 saw the beginning of the end of the relationship between Principal Cavanaugh and Wadsworth. On September 19, 2017, during Wadsworth's senior year, Police Officer Christopher Spear, assigned as a Medomak school resource officer, pulled her over for speeding. Wadsworth was driving the car that Principal Cavanaugh had purchased for her. Officer Spear inquired as to why the registration was in Cavanaugh's name and later met with Cavanaugh about the incident. Officer Spear then reached out to Assistant Principal Philbrook to express his concerns about Wadsworth driving a car that Cavanaugh owned and insured.

Philbrook told Officer Spear that she was aware that Wadsworth had worked for Cavanaugh over the summer, and so when she learned Wadsworth was purchasing the car from Cavanaugh it did not concern her. She then explained that she and Pease had received complaints about the amount of time Principal Cavanaugh spent with Wadsworth and about him frequently excusing her from class. She also explained that both she and Pease "had tried to have professional conversations" with Cavanaugh about his relationship with Wadsworth. Assistant Principal Philbrook also explained that Principal Cavanaugh had asked Wadsworth to live with him. Officer Spear reported this to the police chief, who advised him to "closely monitor the situation," as it did not appear that a criminal act had been committed, only that Cavanaugh was exercising poor judgment.

Throughout this period, Theresa Kenniston, with whom Wadsworth lived, had grown steadily more concerned about Principal Cavanaugh's conduct toward Wadsworth. In October 2017, Theresa became aware that he had asked Wadsworth if she had ever sent nude photos. After learning this, she called the police. When the police arrived, Theresa gave the police Wadsworth's cell phone, which the Kenniston family paid for. Accordingly, the police accessed the text messages between Cavanaugh and Wadsworth.

Shortly thereafter, Theresa Kenniston submitted a statement to police detailing her concerns about the relationship

between Principal Cavanaugh and Wadsworth. She explained that Wadsworth had told her that Cavanaugh "call[ed] her cupcake, pull[ed her out o[f c]lass to give her gifts or ask her how she is doing[,] and text[ed] her frequently." She also explained that she understood Principal Cavanaugh to have arranged for Wadsworth to have a doctor's appointment to get birth control. Further, she understood that Principal Cavanaugh had "got[ten] a hold of" a naked picture of another student and that he had "gawked" at the photo.

Following Theresa Kenniston's report, on November 2, the police chief contacted Superintendent Nolan and conveyed the concerns regarding the text messages. The chief asked that Nolan not take any action for twenty-four hours so as to not compromise law enforcement's investigation. On November 5, Nolan put Cavanaugh on leave and instructed him not to report to Medomak the next day. Thereafter, Superintendent Nolan initiated an investigation into Cavanaugh's conduct. While the investigation was ongoing and after Cavanaugh was instructed to not go onto school property, Cavanaugh's attorney approached Wadsworth on school property and asked her to sign an affidavit in support of Cavanaugh. Nguyen later encouraged Wadsworth to sign the affidavit and told her that she should apologize to Principal Cavanaugh's family because they "had a right to be angry" at her.

After investigating the situation, Superintendent Nolan prepared a memorandum to the school board recommending that Cavanaugh be dismissed. However, before the board met, in December 2017, Cavanaugh resigned as principal. The police never charged him with any crime in connection to his relationship with Wadsworth.

## B. Procedural History

In December 2019, Wadsworth initiated this lawsuit in district court against Cavanaugh, Nguyen, and MSAD.[6] Specifically, her complaint alleges that Principal Cavanaugh harassed and discriminated against her and was therefore liable for depriving Wadsworth of her constitutional rights in violation of 42 U.S.C. § 1983. The complaint does not articulate the specific rights Wadsworth alleges Cavanaugh violated, but the litigation below establishes that Wadsworth sought to advance two separate theories of liability: (1) that Principal Cavanaugh had violated her substantive due process rights by depriving Wadsworth of her right to be free from invasions of her bodily integrity and (2) that

---

[6] Wadsworth initially also alleged claims against Medomak Valley High School. However, after MSAD filed a motion to dismiss explaining that Maine law did not recognize high schools as legal entities, Wadsworth filed an amended complaint removing Medomak Valley High School as a defendant.

Principal Cavanaugh had violated her equal protection rights by sexually harassing her.

Wadsworth alleged that Nguyen was also liable for depriving her of her constitutional rights in violation of § 1983 "by, among other acts and omissions, his failure to protect [her] when she complained about [Principal Cavanaugh's] sexual harassment and discrimination." Again, her complaint does not list the specific rights that she alleges Nguyen violated, but the ensuing litigation establishes that Wadsworth's § 1983 claim encompasses three distinct bases for liability: (1) supervisor liability, (2) violation of Wadsworth's equal protection rights, and (3) violation of Wadsworth's substantive due process rights on a state-created-danger theory.

Finally, Wadsworth alleged that MSAD was liable for depriving her of her constitutional rights in violation of § 1983 by failing to follow, apply, or enforce laws preventing harassment and discrimination and by failing to adequately train and supervise employees regarding their obligations to address sexual harassment at Medomak. She also alleged that MSAD had been deliberately indifferent to the harassment in violation of Title IX.

Early on, Nguyen filed a motion to dismiss the constitutional claims against him, asserting that Wadsworth had "fail[ed] to state an actionable claim because her state-created danger theory does not apply, she did not allege the necessary

facts for a direct equal protection claim, . . . the § 1983 claims cannot be premised upon [supervisory] liability," and, regardless, that qualified immunity protects him from suit. The district court "conclude[d] that [Wadsworth] alleged a viable substantive due process claim under § 1983 but not a viable" supervisor-liability claim and that "qualified immunity d[id] not require dismissal." Wadsworth v. Me. Sch. Admin. Dist. 40/Reg. Sch. Unit 40, 19-cv-00577-JAW, 2020 WL 5880471, at *1, *17 (D. Me. Oct. 2, 2020). More specifically, the district court held that there could be no supervisory liability because "Wadsworth made no allegation that . . . Nguyen had control over . . . Cavanaugh's actions."

All three defendants moved separately for summary judgment, and the district court issued three separate decisions on those motions. Cavanaugh sought summary judgment on both the substantive due process claim and the equal protection claim. As to the substantive due process claim, the district court determined that Wadsworth could not establish that Principal Cavanaugh violated her right to bodily autonomy given that there was no physical aspect to Cavanaugh's conduct and that, in any event, Cavanaugh was entitled to qualified immunity. On the equal protection claim, the district court determined that Wadsworth had established the elements of the claim but that Cavanaugh was nevertheless protected by qualified immunity because no First Circuit case had determined that such conduct could be the basis

- 17 -

of an equal protection violation. Thus, the district court granted Cavanaugh summary judgment on the constitutional claims. Wadsworth v. Me. Sch. Admin. Dist. 40/Reg. Sch. Unit 40, 19-cv-00577-JAW, 2023 WL 2714028, at *1 (D. Me. Mar. 30, 2023).

Nguyen sought summary judgment on the remaining constitutional claim against him -- the substantive due process claim. In granting the motion, the district court concluded that Wadsworth had failed to establish that Nguyen's behavior "shocked the conscience," as was required to establish a state-created-danger substantive due process claim. The district court also determined that, regardless, Nguyen was entitled to qualified immunity. Wadsworth v. Me. Sch. Admin. Dist. 40/Reg. Sch. Unit 40, 19-cv-00577-JAW, 2023 WL 2714027, at *1 (D. Mar. 30, 2023).

Finally, MSAD moved for summary judgment on the § 1983 municipal liability claim and the Title IX claim. As to municipal liability, the district court determined that Wadsworth could not establish liability under § 1983 on either of her theories. With respect to Title IX, the court determined that Wadsworth could not establish that "an official with the authority to implement corrective measures had actual knowledge of the alleged harassment and acted with deliberate indifference toward" Wadsworth. Thus, the district court granted summary judgment to MSAD. Wadsworth v.

- 18 -

<u>Me. Sch. Admin. Dist. 40/Reg. Sch. Unit 40</u>, 663 F. Supp. 3d 83, 89 (D. Me. 2023).

Wadsworth now appeals the three grants of summary judgment as well as the earlier dismissal of the supervisor-liability claim against Nguyen.

## II. Standard of Review

This case requires review of both a decision on a motion to dismiss and decisions on motions for summary judgment. Because the appeal's primary challenge is to the summary judgment decisions, however, we recite that standard here:

> We review a district court's grant of a motion for summary judgment de novo. We must construe the evidence "in the light most congenial to the nonmovant," and will affirm the grant of summary judgment where the record "presents no genuine issue as to any material fact and reflects the movant's entitlement to judgment as a matter of law."

<u>Mullane</u> v. <u>U.S. Dep't of Just.</u>, 113 F.4th 123, 130 (1st Cir. 2024) (footnote and internal citation omitted) (quoting <u>McKenny</u> v. <u>Mangino</u>, 873 F.3d 75, 80 (1st Cir. 2024)). We apply this standard unless otherwise indicated.

## III. Discussion

As an initial matter, because many of Wadsworth's claims are made pursuant to § 1983, we set forth the elements of such a claim. "To succeed, [a plaintiff] must show: (1) that the complained-of conduct was committed under the color of state law,

- 19 -

and (2) that such conduct violated [their] constitutional or federal statutory rights." Miller v. Town of Wenham, 833 F.3d 46, 51 (1st Cir. 2016) (citing Chongris v. Bd. of Appeals, 811 F.2d 36, 40 (1st Cir. 1987)). Relevant to all of Wadsworth's § 1983 claims, the parties dispute only whether she established the second element.

Next, because both Cavanaugh and Nguyen argue that qualified immunity protects them, we set forth in part the relevant structure of that review: "We often follow 'a two-step approach' to decide whether a defendant is entitled to summary judgment based on qualified immunity." Perry v. Spencer, 94 F.4th 136, 146 (1st Cir. 2024) (quoting Stamps v. Town of Framingham, 813 F.3d 27, 34 (1st Cir. 2016)). First, we look to "whether there is a genuine issue of disputed fact that would allow a reasonable finder of fact to determine that the defendant violated the plaintiff's federal constitutional rights." Id. Second, if there is such a dispute, we determine "whether the right that the plaintiff can supportably show was violated was clearly established at the time of the defendant's alleged violation." Id. We need not take the steps in "strict sequence" and can resolve the issue at either step. Estrada v. Rhode Island, 594 F.3d 56, 63 (1st Cir. 2010) (quoting Bergeron v. Cabral, 560 F.3d 1, 7 (1st Cir. 2009), abrogated on other grounds by Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009)).

With these general principles set forth, we turn to the specifics of the claims before us.

### A. Claims Against Principal Cavanaugh

We begin with the district court's grant of summary judgment in favor of Cavanaugh, which we affirm with respect to the substantive due process claim but reverse with respect to the equal protection claim.

### 1. Substantive Due Process: Right to be Free From Invasions of Bodily Integrity[7]

The district court determined that Wadsworth could not establish a substantive due process violation and, even if she could, Cavanaugh was entitled to qualified immunity because the constitutional right that he allegedly violated was not clearly established at the relevant time. We affirm but do so on alternative grounds.

The Due Process Clause of the Fourteenth Amendment prohibits a state from depriving a person of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. In this context, when the substantive due process claim is focused on the individual actions of one government official,

_____

[7] To the extent Wadsworth seeks to frame this as a state-created-danger claim, we agree with Cavanaugh and the district court that the theory is inapt. Wadsworth's arguments only establish that she is pursuing a substantive due process claim based on a violation of her fundamental rights. Further, she does not challenge the district court's treatment of the claim as a straightforward substantive due process claim.

untethered to any government policy, "[t]he substantive due process guarantee functions to protect individuals from particularly offensive actions on the part of government officials." Pagán v. Calderón, 448 F.3d 16, 32 (1st Cir. 2006) (citation omitted). "Where, as here, a plaintiff's substantive due process claim challenges the specific acts of a state officer, the plaintiff must show both that the acts were so egregious as to shock the conscience and that they deprived him of a protected interest in life, liberty, or property." Id. (citing Rivera v. Rhode Island, 402 F.3d 27, 34 (1st Cir. 2005)).

Wadsworth bases her substantive due process claim against Cavanaugh on her right to be free from invasions of her bodily integrity. The right to bodily integrity is well established, see, e.g., Vacco v. Quill, 521 U.S. 793, 807 (1997) (noting "well-established, traditional rights to bodily integrity and freedom from unwanted touching"); however, identifying a right is but the first step. Wadsworth must also establish that the alleged conduct at issue deprived her of that protected right. See Pagán, 448 F.3d at 32. Cavanaugh argues that Wadsworth cannot do so because the case law defining the right to bodily integrity requires a physical invasion and Wadsworth has neither alleged nor established a physical component to the harassment.

The district court concluded that Wadsworth could not satisfy either prong of the due process analysis -- i.e., that she

could not show that Principal Cavanaugh's conduct violated her rights or that his conduct shocked the conscience. Specifically, the district court determined that Wadsworth could not, as a matter of law, make out a violation of her right to bodily integrity because there was no "authority supporting the proposition that non-physical harassment alone can violate the right to bodily integrity." The district court explained that the case law finding that sexual harassment is a violation of the right to bodily integrity is, to date, limited to instances where the harassment had a physical component.

The district court also held it could not conclude that Principal Cavanaugh's conduct was conscience shocking. It explained that because no First Circuit case had unequivocally determined that non-physical harassment rose to the level of conscience shocking it could not find that Cavanaugh's conduct shocked the conscience.[8]

---

[8] To the extent the district court believed that a lack of on-point First Circuit case law could be an independent basis for denying summary judgment, we note that whether conduct shocks the conscience is a fact-intensive inquiry, see Pagán, 448 F.3d at 32, and this court has made clear that, although we have yet to encounter non-physical conduct that rises to that level, in the right circumstances (if sufficiently egregious), exclusively verbal harassment could rise to the level of conscience shocking. See Brown v. Hot, Sexy and Safer Prods., Inc., 68 F.3d 525, 532 (1st Cir. 1995) ("Although we have not foreclosed the possibility that words or verbal harassment may constitute conscious [sic] shocking behavior in violation of substantive due process rights, our review of the case[ ]law indicates that the threshold for alleging such claims is high and that the facts alleged here do

On appeal, Wadsworth argues that the district court erred in concluding that non-physical harassment could not shock the conscience and, in turn, erred in concluding that Wadsworth's substantive due process claim was not viable. Wadsworth does not, however, address the question of whether non-physical harassment can violate the right to bodily integrity; she merely argues that a jury could conclude that Principal Cavanaugh's conduct was "shocking or violative of universal standards of decency."[9] (Quoting Amsden v. Moran, 904 F.2d 748, 754 (1st Cir. 1990)). As we have explained, Wadsworth must establish both that Cavanaugh's conduct was conscience shocking and that it violated her fundamental right to bodily integrity. See Pagán, 448 F.3d at 32. Because she does not challenge the district court's conclusion as to the latter or present any argument as to why we must conclude that non-physical harassment violated her rights, her appellate

not rise to that level." (internal quotation marks and citations omitted)); Souza v. Pina, 53 F.3d 423, 427 (1st Cir. 1995) (same); Pittsley v. Warish, 927 F.2d 3, 7 n.3 (1st Cir. 1991) (same), abrogated on other grounds by Martinez v. Cui, 608 F.3d 54, 63-65 (1st Cir. 2010).

[9] In another section of her brief, Wadsworth argues that "[t]here are innumerable cases stating th[e] proposition" that sexual harassment violates the right to bodily integrity. While this is technically correct, Wadsworth has not connected those cases to the type of harassment alleged here -- that which does not involve physical abuse. Wadsworth relies exclusively on cases that hold that physical sexual harassment violates the right to bodily integrity and, as we have already explained, she has mounted no argument as to why the right must be expanded to include non-physical harassment.

claim must fail.[10]  Cf. Morgan v. Town of Lexington, 823 F.3d 737, 742-44 (1st Cir. 2016) (deciding bodily integrity case alleging bullying on shocks-the-conscience step).  Accordingly, we affirm the district court's grant of summary judgment to Cavanaugh with respect to Wadsworth's substantive due process claim, without considering whether the second prong of qualified immunity would also protect Cavanaugh -- the district court's second basis for granting summary judgment.

---

[10] Wadsworth cited no case where a court concluded that sexual harassment with no physical component amounted to a violation of a person's fundamental right to be free from invasions of their bodily integrity.  Nonetheless, as the district court explained:

> This area of law may be ripe for reexamination as to whether pervasive, non-physical sexual harassment may be as harmful to the victim's constitutional right to bodily integrity as some forms of physical abuse. . . .

> Here, a high school principal engaged in prolonged, pervasive, and persistent sexual harassment of a teenage girl under his authority, who was struggling with a difficult family situation, and his actions were bound to cause confusion, emotional distress, worry, and other significant psychological harms.  If Mr. Cavanaugh had even momentary sexual contact with Ms. Wadsworth, the [c]ourt could apply an entirely different analysis to this case . . . it strikes the [c]ourt that the current state of the law artificially diminishes the impact of psychological sexual harassment.

However, this case does not present the opportunity to reexamine the confines of the right, so we leave for another day the question of whether non-physical harassment violates the right to bodily integrity.

## 2. Equal Protection: Sex Discrimination

The district court also granted Cavanaugh summary judgment on Wadsworth's equal protection claim, determining that although Wadsworth had established a constitutional violation, Cavanaugh was nevertheless entitled to qualified immunity. In pertinent part, the district court concluded that Wadsworth could not show that the constitutional right at issue was clearly established at the time it was allegedly violated because she had not pointed to any First Circuit case law on point.

On appeal, Wadsworth argues, as she did below, that out-of-circuit precedent renders the constitutional right well established. Cavanaugh responds that (1) the district court erred in concluding that Wadsworth could establish an equal protection violation in the first place, (2) Wadsworth waived review of any argument that the district court's qualified immunity analysis was erroneous for lack of development, and (3), in any event, he is entitled to qualified immunity because the right was not clearly established. For the reasons explained below, we conclude that the district court correctly determined that Wadsworth's equal protection claim was valid, despite applying the incorrect test, that Wadsworth did not waive her qualified immunity argument, and that the district court erred in deciding that Cavanaugh is entitled to qualified immunity at the summary judgment stage. We

therefore reverse the district court's grant of summary judgment to Cavanaugh on Wadsworth's equal protection claim.

### a. Applicable Framework

To make out an equal protection claim, the district court stated that Wadsworth was required to, and did, establish both that she was "selectively treated compared with others similarly situated and that such treatment was based on impermissible considerations." The district court determined that "when the claim is brought against the alleged perpetrator directly, the question is not whether [they] treated this victim differently from another victim of harassment; instead, it is whether [they] harassed the victim due to an impermissible consideration." Because Wadsworth alleged that Principal Cavanaugh harassed her and treated her differently because of her sex, the "similarly situated comparators would thus be male students at [Medomak Valley High School.]" On appeal, Cavanaugh challenges this portion of the district court's analysis, arguing that "all male students" cannot be a "factually similar comparator."

Although the parties and district court all seem to agree that the applicable test requires Wadsworth to establish the existence of a similarly situated comparator, that is not correct.[11] The Equal Protection Clause provides that "[n]o State

---

[11] We do not consider Wadsworth's request for the application of an incorrect legal test to be a waiver because parties may not

shall . . . deny to any person within its jurisdiction the equal protection of the laws," U.S. Const. amend. XIV, § 1, and requires that "all persons similarly situated be treated alike." Rocket Learning, Inc. v. Rivera-Sánchez, 715 F.3d 1, 10 (1st Cir. 2013) (cleaned up) (quoting City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985)). It is well established that sex discrimination violates the Equal Protection Clause. See Lipsett v. Univ. of P.R., 864 F.2d 881, 896–97 (1st Cir. 1988). Sexual harassment is a type of sex discrimination. See id. at 896-98. Though an equal protection claim often requires a plaintiff to establish "that '(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person,'" Davis v. Coakley, 802 F.3d 128, 132-33 (1st Cir. 2015) (quoting Rubinovitz v. Rogato, 60 F.3d 906, 910 (1st Cir. 1995)),

_____

waive or stipulate to the use of an inappropriate legal test. See TI Fed. Credit Union v. DelBonis, 72 F.3d 921, 928 (1st Cir. 1995) ("Issues of law are the province of courts, not of parties to a lawsuit, individuals whose legal conclusions may be tainted by self-interest. Courts, accordingly, 'are not bound to accept as controlling, stipulations as to questions of law.'" (quoting Sanford's Est. v. Comm'r, 308 U.S. 39, 51 (1939))); see also Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 99 (1991) ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law.").

as the concurrence explains, a relevant comparator is not necessarily a requirement under the Equal Protection Clause. This is one such situation; an equal protection sexual harassment claim requires a different form of analysis.

In Lipsett, the court adopted the framework applicable to Title VII and Title IX sexual harassment claims against a teacher or supervisor to an equal protection claim alleging sexual harassment. 864 F.2d at 897; see also Hayut v. State Univ. of N.Y., 352 F.3d 733, 738-39, 743 (2d Cir. 2003) (employing Title VII standard to assess equal protection hostile educational environment claim); Roy v. Correct Care Sols., LLC, 914 F.3d 52, 61 (1st Cir. 2019) (same for claim brought under both Title VII and Equal Protection Clause). Following that precedent, we also look to Title VII and Title IX to set forth the applicable framework.

Where a plaintiff alleges that the perpetrator created a hostile environment by "forc[ing] a [student] [to] run a gauntlet of sexual abuse in return for the privilege of being allowed to [go to school]," Lipsett, 864 F.2d at 897 (second alteration in original) (citation omitted), the plaintiff must show that they were (1) subjected to unwelcome harassment (2) on the basis of sex and (3) that the harassment was sufficiently severe or pervasive to create an abusive educational environment. See id.; Grace v. Bd. of Trs., Brooke E. Boston, 85 F.4th 1, 11 (1st Cir. 2023)

(quoting Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 66 (1st Cir. 2002)); Nieves-Borges v. El Conquistador P'ship, L.P., S.E., 936 F.3d 1, 8 (1st Cir. 2019).

Additionally, "[t]he 'plaintiff must show that [they] subjectively perceived the environment to be hostile or abusive and that the environment objectively was hostile or abusive, that is, that it was permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the conditions of [their] educational environment.'" Roe v. St. John's Univ., 91 F.4th 643, 661 (2d Cir. 2024) (quoting Papelino v. Albany Coll. of Pharmacy of Union Univ., 633 F.3d 81, 89 (2d Cir. 2011)); see Nieves-Borges, 936 F.3d at 8 (in Title VII hostile environment claim plaintiff must show that "sexually objectionable conduct was both objectively and subjectively offensive" (quoting Roy, 914 F.3d at 62)). Whether a plaintiff makes this showing is determined "'in light of the record as a whole' and the 'totality of the circumstances.'" Lipsett, 864 F.2d at 898 (quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 69 (1986)); see also Nieves-Borges, 936 F.3d at 8.

Here, Wadsworth alleged that Principal Cavanaugh's conduct created a hostile educational environment for her at Medomak. Thus, she need not have established the existence of a similarly situated comparator in order to make out her claim against Cavanaugh. See Lipsett, 864 F.2d at 897. We now turn to

whether, applying the proper test, Wadsworth's equal protection claim against Cavanaugh is viable. We conclude that it is.

### b. Application of the Framework

Viewing the record as a whole and considering the totality of the circumstances, as we must, we conclude that a reasonable jury could find that Wadsworth made out each of the necessary elements of her claim that Principal Cavanaugh violated the Equal Protection Clause by creating and subjecting Wadsworth to a hostile educational environment at Medomak. See Lipsett, 864 F.2d at 898.

To begin, we consider whether a jury could find that Principal Cavanaugh's conduct amounted to sexual harassment, which is necessarily harassment based on sex. See Nieves-Borges, 936 F.3d at 9-10. We have expounded on various types of behavior that amount to sexual harassment: In Lipsett, we explained that such conduct could be comprised of, among other things, "verbal expressions." 864 F.2d at 898. We have also stated that "behavior like . . . come-ons[] and lewd remarks is often the stuff of" sexual harassment. Gerald v. Univ. of P.R., 707 F.3d 7, 18 (1st Cir. 2013) (quoting Billings v. Town of Grafton, 515 F.3d 39, 48 (1st Cir. 2008)). We have also pointed to "[e]vidence of sexual remarks, innuendos, ridicule, and intimidation" as sufficient to support a jury verdict on sexual harassment. Franchina v. City of Providence, 881 F.3d 32, 54 (1st Cir. 2018) (quoting O'Rourke v.

City of Providence, 235 F.3d 713, 729 (1st Cir. 2001)). Further, "a 'raft of case law establishes that the use of sexually degrading, gender-specific epithets, such as slut, . . . whore, and bitch has been consistently held to constitute harassment based upon sex.'" Id. (cleaned up) (quoting Forrest v. Brinker Int'l Payroll Co., 511 F.3d 225, 229 (1st Cir. 2007)); see also Lipsett, 864 F.2d at 903 (noting "sexually charged nicknames" as contributing to sexual harassment). Finally, a harasser's motivation need not include "evidence of explicit sexual propositions," Nieves-Borges, 936 F.3d at 9, rather it may be inferred from "implicit proposals," id. at 9-10 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)).

Wadsworth has presented a plethora of evidence from which a jury could find that Principal Cavanaugh sexually harassed her. For one, Cavanaugh often sent messages containing sexual innuendos, which could be read as implying an interest in having a sexual relationship with Wadsworth. He asked for pictures of her in a swimsuit and whether she had taken nude pictures of herself; regularly discussed her appearance, describing her as attractive and as having "a pretty big rack" and breasts that made him "a little dizzy!"; asked her about her sex life; and used sexually charged, "gender-specific epithets" to refer to Wadsworth such as "ho," "skank," "bitch," and "lady time." See Jennings v. Univ. of N.C., 482 F.3d 686, 695 (4th Cir. 2007) (jury could find

"crude questions and comments" about student's sexual activities, comments about student's body, and discussions of sexual fantasies about student amounted to sexual harassment). The sexual nature of these interactions is facially apparent, and, although Cavanaugh contends that everything was said in jest, a reasonable jury could reject that explanation. See id. at 695 (harasser's contention that "sex-focused comments were 'of a joking and teasing nature'" rejected where jury could conclude the comments "were degrading and humiliating").

We next consider whether a jury could conclude that Principal Cavanaugh's conduct was unwelcome. In Lipsett, we explained that unwelcomeness must be considered from the perspective of all involved parties and, as relevant here, that "consistent failure to respond to suggestive comments or gestures may be sufficient to communicate that the . . . conduct is unwelcome." 864 F.2d at 898. The record reflects that on many occasions when Principal Cavanaugh sent suggestive text messages, Wadsworth would not respond for an extended period of time. Although Wadsworth described many of their conversations as "joking" and explained that talking to Cavanaugh was like talking to "a teenage friend," she also testified that because of her difficult home life Principal Cavanaugh "was one of the only people . . . [she] could rely on" and that she "didn't want to mess that up by saying that [she was] uncomfortable" discussing certain

topics. Wadsworth went on to explain that "she remembered thinking that there [were] certain times where [she] should say [she didn't] want to talk about this or [she] should not engage in this and probably shouldn't be talking about this, and felt that it [went] a little too far." She explained that she considered "several options [to stop the conversations]" such as telling Principal Cavanaugh "it made [her] feel uncomfortable" but worried that doing so "would change [their] dynamics a lot" and that "if [she] made it a big deal" it could "affect school and [make it] awkward to go to school" and "how can [one] ignore the principal in the school and how is it going to make school awkward." She went on to explain that, "instead of telling [Principal Cavanaugh] that he was making [her] feel uncomfortable, [Wadsworth] would just find other ways to do it and just not answer and say that [she] was at practice or doing homework or [she] was busy and just ho[ped] that the conversation would change from there."

Additional record evidence that supports a jury finding of unwelcomeness includes Wadsworth's young age (she was sixteen, later seventeen, during the relevant period); her vulnerability given her home life; and the power imbalance between Wadsworth, a teenage high school student, and Cavanaugh, the fifty-something school principal. Based on this substantial record evidence, in addition to Wadsworth's sworn deposition testimony, a jury could

reject Cavanaugh's contention that Wadsworth was a willing participant and find that his conduct was unwelcome.

The conduct must also have been sufficiently severe or pervasive. We conclude that a reasonable jury could find that the record supports that Principal Cavanaugh's conduct was severe and/or pervasive. Here, we look to "numerous factors (to which we assign no particular determinative weight)" including "severity of the discriminatory conduct, its frequency, the extent to which the behavior is physically threatening or humiliating as opposed to a mere offensive utterance, and the extent to which it unreasonably interferes with an employee's work performance." Franchina, 881 F.3d at 46 (citing Gerald, 707 F.3d at 18).

The record reveals near daily messages from Principal Cavanaugh sent at all hours, including during the school day and late at night, and weekly (if not daily) meetings. While Principal Cavanaugh sent many unremarkable messages, the sheer volume and the consistent discussion of topics related to sex, Wadsworth's romantic life, and her appearance could lead a jury to conclude that Cavanaugh's harassment was pervasive. See Hayut, 352 F.3d at 746 (noting that a "reasonable trier of fact" could find pervasiveness where professor used sexualized nickname to refer to student "during many periods of instruction"). Further, a reasonable jury could find that some of Principal Cavanaugh's text messages, especially given Wadsworth's age and Cavanaugh's

- 35 -

position of power, were severe. In addition to sexually charged messages relating to her appearance, the comments and implications of violence Principal Cavanaugh sent when Wadsworth did not reply quickly to his inquiries are particularly illustrative of the "threatening [and] humiliating" nature of Cavanaugh's conduct. Franchina, 881 F.3d at 46. Principal Cavanaugh's use of sexualized nicknames and inquiries into Wadsworth's sex life could also allow a reasonable jury to find that his actions "were severe enough to transcend the bounds of propriety and decency, let alone harmless humor, and become actionable harassment[.]" Hayut, 352 F.3d at 747 (concluding that a jury could find comments with "powerful sexual connotations and overtones" to be severe).

Next, a reasonable jury could conclude that Principal Cavanaugh's conduct was both subjectively and objectively offensive. To begin, a jury could reasonably find that Cavanaugh's conduct was objectively offensive given the nature and context of Principal Cavanaugh's comments, particularly the sexual overtones and the power imbalance between a principal and student. Cf. Jennings, 482 F.3d at 696-97 (assessing harasser's "tremendous power and influence" as part of the "constellation of surrounding circumstances, expectations, and relationships"). In addition, a jury could conclude that Wadsworth found Cavanaugh's conduct offensive because, although she sometimes considered Cavanaugh to be "joking," she also testified that the messages made her

"uncomfortable" and that she sought out ways to make Principal Cavanaugh stop without negatively impacting her school life.

Finally, a reasonable jury could conclude that Principal Cavanaugh's conduct impacted Wadsworth's learning environment. See Lipsett, 864 F.2d at 898. Support for this finding includes the messages Principal Cavanaugh sent throughout the school day, his frequent meetings with Wadsworth during both her class time and study hall (coupled with evidence that this caused her stress), the content of his messages to her, her concern that her responses to his messages could impact her experience at school, and the fact that his treatment of Wadsworth was a frequent source of gossip for other students and teachers. On this record, a reasonable jury could conclude that Cavanaugh's conduct created "an abusive [educational] environment." Id.

Accordingly, we reject Cavanaugh's contention that we may affirm on the alternate grounds that Wadsworth's equal protection claim is not viable.

We turn now to Cavanaugh's argument that, even if Wadsworth's equal protection claim is viable, qualified immunity bars her claim against him.

### c. Entitlement to Qualified Immunity

Qualified immunity "is available to public officials whose 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have

known.'" Bergeron, 560 F.3d at 5 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "Clearly established means that, at the time of the [official's] conduct, the law was sufficiently clear that every reasonable official would understand that what they are doing is unlawful." Heredia v. Roscoe, 125 F.4th 34, 46-47 (1st Cir. 2025) (quoting Segrain v. Duffy, 118 F.4th 45, 57 (1st Cir. 2024)); see also Penate v. Sullivan, 73 F.4th 10, 18 (1st Cir. 2023) (explaining that we consider "the clarity of the law" and whether, "on the facts of the particular case," "a reasonable defendant would have understood that [their] conduct violated the plaintiff['s] constitutional rights." (cleaned up) (quoting Maldonado, 568 F.3d at 269)). "Indeed, '[i]t is important to emphasize that this inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition.'" Maldonado, 568 F.3d at 269 (quoting Brosseau v. Haugen, 543 U.S. 194, 195 (2004)). "Cognizant of both the contours of the allegedly infringed right and the particular facts of the case, '[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [school administrator or teacher] that [their] conduct was unlawful . . . .'" Id. (quoting Brosseau, 543 U.S. at 199). In other words, we ask "whether the state of the law at the time of the alleged violation gave [Cavanaugh] fair warning that his

particular conduct was unconstitutional." Id. (citing Hope v. Pelzer, 536 U.S. 730, 741 (2002)).

The district court decided the issue on narrow grounds, concluding that Wadsworth had not established the right was clearly established because she failed to cite any First Circuit authority holding that a teacher's non-physical sexual harassment of a student violates the student's equal protection rights where the harassment is devoid of hostility and "direct sexual advances." On appeal, Wadsworth argues this was error, pointing us to several out-of-circuit cases that she argues make clear that the equal protection right to be free from non-physical sexual harassment was clearly established at the time the conduct occurred. Cavanaugh argues Wadsworth waived this issue by insufficiently addressing it in her principal brief and, secondly, that Wadsworth cannot succeed without citing binding precedent. Neither contention is availing. As we will lay out below, we conclude that the district court erred as a matter of law when it determined that Wadsworth could not demonstrate that the constitutional violation was clearly established and that, given our equal protection analysis, Cavanaugh is not entitled to summary judgment on qualified immunity.

First, we reject Cavanaugh's contention that Wadsworth waived the issue for lack of development. See Mazariegos v. Lynch, 790 F.3d 280, 285 n.5 (1st Cir. 2015) (claim "unaccompanied by any

developed argument or legal support" may be waived).  Wadsworth sufficiently developed her position by citing five cases to support her argument.  Because these cases speak for themselves, there was no need for Wadsworth to explain at length how they support her position.  The issue is not waived.

Next, we reject Cavanaugh's assertion that a litigant must point to in-circuit law in order to show that a right is clearly established.  It is well recognized "that clearly established law can be dictated by controlling authority or a robust consensus of persuasive authority."  Irish v. Fowler, 979 F.3d 65, 77 (1st Cir. 2020) (citing Dist. of Columbia v. Wesby, 583 U.S. 48, 63 (2018)).  And, we have made clear that we may "look[] to the case law of sister circuits in determining whether a right was clearly established."  McCue v. City of Bangor, 838 F.3d 55, 63 (1st Cir. 2016).  Thus, we turn to the relevant case law.

On review, we agree with Wadsworth that at the time in question her equal protection right to be free from non-physical harassment was clearly established -- under both out-of-circuit case law and First Circuit case law.  Given our analysis of the claim as to what a reasonable jury could find on this record, it is clear that, at this juncture, qualified immunity does not protect Principal Cavanaugh.

To begin, as discussed earlier in this decision, in Lipsett, this court made clear that sexual harassment in the form of "pointed threats," "sexual advances," and "sexually charged nicknames," along with other forms of sex-based comments, is enough to establish a prima facie case of sexual harassment in an educational context. 864 F.2d at 903-04 (addressing sexual harassment in the context of a medical residency program, covered by both Title IX and Title VII); id. at 902 ("If such a state official directly engaged in sexual harassment or sexual discrimination, [they] would, of course, be subject to [§] 1983 liability" on an equal protection violation theory). Lipsett, standing alone, provides clear guidance that a teacher's conduct that includes threats, sexualized comments, and sexually charged nicknames can rise to the level of sexual harassment.[12]

Further, Wadsworth has pointed our attention to four other circuits that have held that conduct similar to what is alleged here -- perpetrated by an educator against a student -- violates the student's equal protection rights. See Maldonado, 568 F.3d at 270-71 (noting, in the context of a different

---

[12] We note that Wadsworth has not cited Lipsett to support her position. Instead, she relies on out-of-circuit case law. This is of no matter, however, as, "[i]n conducting a qualified immunity analysis, a court should 'use its full knowledge of its own [and other relevant] precedents.'" Barton v. Clancy, 632 F.3d 9, 22 (1st Cir. 2011) (quoting Elder v. Holloway, 510 U.S. 510, 516 (1994)). Furthermore, the out-of-circuit cases on their own are sufficient to support our conclusion.

constitutional right, that "[t]hree other circuits had announced [the right] well before the violations alleged here" and concluding that officials were not entitled to qualified immunity).

In Hayut, the Second Circuit addressed a sexual harassment equal protection claim against a college professor who persistently referred to his student as "Monica," a reference to her resemblance to Monica Lewinsky, and made other pointed remarks referencing the then-recent Lewinsky-Clinton sex scandal both privately and in class. 352 F.3d at 738-39, 743. On those facts, the court determined that the plaintiff had alleged an equal protection claim sufficient to survive summary judgment, concluding that the sexually-charged "comments were severe enough to transcend the bounds of propriety and decency, let alone harmless humor, and become actionable harassment based on [the plaintiff's] sex." Id. at 744-45, 747. A jury could find that Principal Cavanaugh engaged in a similar course of conduct. While his behavior was far less public, he used sex-based epithets and infused conversations with Wadsworth with sexual commentary and remarks regarding Wadsworth's attractiveness.

In Jennings, the Fourth Circuit reviewed a sexual harassment equal protection claim brought by a university student against her soccer coach. 482 F.3d at 691. The coach "engaged in sexually charged talk in team settings," "bombarded players with crude questions and comments about their sexual activities[,] made

- 42 -

comments about players' bodies that portrayed them as sexual objects," and "expressed . . . his sexual fantasies about certain players." Id. at 691. The court determined that a jury could reasonably find that the coach's conduct amounted to sexual harassment in violation of the student's equal protection rights. Id. at 695-96, 701. Here, Principal Cavanaugh engaged in similar conduct that a reasonable jury could find involved "sexually charged talk," "crude question[ing]," and sexual objectification.

In Delgado v. Stegall, at the motion to dismiss stage, the Seventh Circuit explained that a university teacher violated a student's equal protection rights by "repeatedly asking her 'Do you love me?' and 'Would you ever marry a man like me?'" and by "ask[ing] her for hugs, rub[bing] her shoulders, and tickl[ing] her." 367 F.3d 668, 670, 673 (7th Cir. 2004), abrogated on other grounds by Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246, 259 (2009). Although Principal Cavanaugh did not engage in similar physical conduct, a reasonable jury could find his remarks hit a similar tone of obsessive sexual interest.

Finally, in Doe v. Hutchinson, an unpublished case, the Tenth Circuit remarked that "[i]t is well[-]established in [the Tenth Circuit] that sexual harassment by a state actor can constitute a violation of the [E]qual [P]rotection [C]lause" and went on to explain that where a high school teacher was alleged to have spoken about students in sexualized terms, inquired into and

made jokes about the student-plaintiff's sex life, and discussed his own sex life, the student had alleged a viable hostile environment equal protection claim. 728 F. App'x 829, 830-31, 832 (10th Cir. 2018) (quoting Murrell v. Sch. Dist. No. 1, 186 F.3d 1238, 1249 (10th Cir. 1999)). Again, Principal Cavanaugh engaged in a similar course of conduct in his treatment of Wadsworth -- using sexualized nicknames, asking about her sex life, her physical appearance, and invoking sexual innuendos.

Although these cases do not present factual scenarios identical to the one at hand, identicality is not required. As we have explained, "[i]n arguing for clearly established law, a plaintiff is not required to identify cases that address the particular factual scenario that characterizes [their] case." Alfano v. Lynch, 847 F.3d 71, 76 (1st Cir. 2017). Instead, "'[g]eneral statements of the law are not inherently incapable of giving fair and clear warning to public officials,' rather, the existence of fair and clear warning depends on whether[] 'in the light of pre-existing law' the unconstitutionality of the challenged conduct is 'apparent.'" Id. (citations omitted) (first quoting United States v. Lanier, 520 U.S. 259, 271 (1997), then quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). In fact, the cases described do not present a general statement of law but rather describe situations quite similar to what Wadsworth experienced here. Moreover, the students in those cases were

arguably far less vulnerable than Wadsworth was and the power differential between the victims and their perpetrators was, in comparison, arguably much smaller than the student-principal dynamic at play here. Each of the cases discussed above, with the exception of Hutchison, involved university students, and, given that students in higher education are generally older and less vulnerable than high school students, it is particularly apparent that the legal principles established in these cases apply equally, if not with more force, to teachers and administrators in the high school setting. Given the facts and holdings in these cases and the record in the present case, a reasonable jury could conclude that Principal Cavanaugh sexually harassed Wadsworth in violation of her equal protection rights, and we have no doubt that, assuming Cavanaugh did so, a reasonable high school teacher or administrator would understand that the described conduct would violate the student's constitutional rights.[13]

## B. Claims Against Nguyen

Now, we turn to whether the district court erred in dismissing the supervisor-liability, equal protection, and substantive due process claims against Nguyen. We first address

---

[13] To the extent the district court and Cavanaugh believe that in order for case law to be clearly established it must not involve hostility or direct sexual advances, we note that none of the cases relied on here depended on hostility or direct sexual advances to conclude that sexual harassment had occurred, and thus we reject this position.

the district court's decision on Nguyen's motion to dismiss -- which concluded that Wadsworth did not have a viable supervisor-liability or equal protection claim -- and then address the substantive due process claim, which the court dismissed at the summary judgment stage. For the reasons that follow, we affirm both decisions.

## 1. Motion to Dismiss

As noted, the district court rejected Wadsworth's supervisor-liability and equal protection claims at the motion to dismiss stage. Accordingly, "[w]e review [the] district court's grant of [the] motion to dismiss de novo." Torres-Estrada v. Cases, 88 F.4th 14, 23 (1st Cir. 2023). "To assess whether a complaint can withstand a Rule 12(b)(6) motion, we 'must accept as true all well-pleaded facts indulging all reasonable inferences in [Appellant's] favor.'" Rae v. Woburn Pub. Schs., 113 F.4th 86, 98 (1st Cir. 2024) (alteration in original) (quoting Fantini v. Salem State Coll., 557 F.3d 22, 26 (1st Cir. 2009)).

We first lay out the relevant facts, taken from Wadsworth's amended complaint. She alleged that Nguyen was a social worker at Medomak, supervised by the Director of Student Services. She also alleged that Nguyen, like other school staff, was required to report "possible incidents of discrimination or harassment" and that a student may also report instances of sexual harassment. Relevant to Nguyen's particular conduct, Wadsworth

- 46 -

alleged that she asked Nguyen about the propriety of certain things Principal Cavanaugh did -- namely, giving Wadsworth personal hygiene products, taking her to a doctor's appointment, and advising her that she should take birth control pills -- and he responded that nothing was inappropriate and that Principal Cavanaugh was "just trying to be a 'father figure.'" She alleged that Nguyen witnessed Cavanaugh comment on Wadsworth's "looks and clothing choices." Following Cavanaugh's suspension, she alleged that Nguyen called her into his office to tell her that "Cavanaugh had a drinking problem."

Accordingly, she alleged that "Nguyen became aware of . . . [Principal] Cavanaugh's inappropriate behavior toward [Wadsworth] in 2016" and, despite this knowledge and "duty to report," he failed to "institute corrective measures to protect [Wadsworth]" although he had the "authority" to do so. Finally, she alleged that once the relationship between Principal Cavanaugh and Wadsworth was reported, Cavanaugh was put on leave and the abuse ended. Finally, Wadsworth alleged that Nguyen "deprived [her] of her rights by, among other acts and omissions, his failure to protect [Wadsworth] when she complained about sexual harassment and discrimination by . . . Cavanaugh."

## a. Supervisor Liability

Here, Wadsworth appeals the district court's dismissal of her supervisor-liability claim against Nguyen.[14] The district court based its decision on narrow grounds, determining that as an initial matter Wadsworth's supervisor-liability claim failed because she had presented "no facts [to] establish that Mr. Nguyen had any control over [Principal] Cavanaugh." Wadsworth argues that the district court applied the incorrect test to determine if Nguyen had control over Cavanaugh. Specifically, she argues that the district court erroneously required Nguyen to be Cavanaugh's "formal supervisor" to be liable under this theory. She then argues that, under the correct test, the alleged facts show that Nguyen had the necessary control over Principal Cavanaugh. While we agree that a defendant need not be a "formal supervisor" to be liable, we disagree with Wadsworth that the district court applied

---

[14] To hold a supervisory defendant liable under § 1983, a plaintiff must show "that (1) 'the conduct complained of was committed by a person acting under color of state law; and (2) [that] this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.'" Lipsett v. Univ. of P.R., 864 F.2d 881, 896 (1st Cir. 1988) (alteration in original) (quoting Voutour v. Vitale, 761 F.2d 812, 819 (1st Cir. 1985)). Here, the connection to equal protection is that Wadsworth alleges that Cavanaugh's conduct violated her equal protection rights. The supervisor-liability claim is then premised on the argument that Nguyen should be liable for that violation.

the incorrect test and came to the incorrect outcome. Accordingly, we affirm the dismissal.

"Generally, a supervisor cannot be held liable under § 1983 on a respondeat superior theory -- a 'supervisor's liability must be premised on [their] own acts or omissions' and does not attach automatically even if a subordinate is found liable." Justiniano v. Walker, 986 F.3d 11, 20 (1st Cir. 2021) (quoting Guadalupe-Báez v. Pesquera, 819 F.3d 509, 515 (1st Cir. 2016)). "Under such a theory, a supervisor may be brought to book even though [their] actions have not directly abridged someone's rights; it is enough that [they have] created or overlooked a clear risk of future unlawful action by a lower-echelon actor over whom [they] had some degree of control." Camilo-Robles v. Zapata (Zapata), 175 F.3d 41, 44 (1st Cir. 1999). Liability attaches where "(1) the behavior of [the] subordinates results in a constitutional violation, and (2) the [supervisor]'s action or inaction was affirmative[ly] link[ed] to that behavior in the sense that it could be characterized as supervisory encouragement, condonation or acquiescence[,] or gross negligence amounting to deliberate indifference." Pineda v. Toomey, 533 F.3d 50, 54 (1st Cir. 2008) (first and fourth alterations added) (quoting Lipsett, 864 F.2d at 902).

Thus, we focus on whether Nguyen can be considered a "supervisor." As we have explained, we do not define "supervisor"

rigidly, rather "supervisor" is "defined loosely to encompass a wide range of officials who are themselves removed from the perpetration of the rights-violating behavior." Camilo-Robles v. Hoyos (Hoyos), 151 F.3d 1, 6-7 (1st Cir. 1998). Again, in order to qualify as a "supervisor," Nguyen must have had "some degree of control" over Principal Cavanaugh. Zapata, 175 F.3d at 44.

Wadsworth argues that our decision in Hoyos is directly applicable. In Hoyos, this court affirmed a decision denying two psychiatrists summary judgment on a § 1983 supervisor-liability claim. 151 F.3d at 12. The psychiatrists had found a suspended police officer "free from mental illness and fit for active duty (with no restrictions)," id. at 5, despite their knowledge of the officer's "stunning history of violence," id. at 11, which included a shootout with "two unarmed, law-abiding neighborhood residents," wherein "he shot both of them, wounding one and killing the other," and threatening to kill a fellow officer, id. at 5. Following this finding, the police department "promptly rearmed [the suspended officer]," who ultimately arrested and assaulted a security guard who advised the officer that he could not park in a parking area reserved for a judge. Id. at 4. The security guard then accused the psychiatrists of "deliberate indifference in carrying out their supervisory responsibilities." Id. at 4-5. On appeal, the psychiatrists contended that they were entitled to qualified immunity; in assessing that claim, we considered whether

the psychiatrists "functioned merely as advisors," ultimately rejecting that argument.  Id. at 12.  In so doing, we explained that the record established that once the psychiatric reviewers gave the go-ahead, the officer under review would be rearmed and returned to service.  Id.

Wadsworth says the same is true here: Nguyen "could have easily stopped the harassment."  Specifically, she says that because Nguyen was required to report the harassment he witnessed and because once the behavior was reported Cavanaugh was suspended, "a court may reasonably infer that a report by Mr. Nguyen would have quickly stopped Principal Cavanaugh."  We are not persuaded.

The allegations merely establish that Nguyen had options to try to stop Cavanaugh, but this is not enough to conclude that Nguyen had any control over Principal Cavanaugh.  In Hoyos, the record made clear that both the psychiatrists themselves and those within the police department understood that "once the examining psychiatrist 'certifies in writing that [an officer] is authorized to bear arms [the police department would] proceed to give back the weapon.'"  151 F.3d at 12 (quoting police superintendent's testimony).  Here, Wadsworth has not alleged that Nguyen had similar control over Cavanaugh; it is not enough here to say that just because Cavanaugh's behavior stopped after it was finally reported, Nguyen also could have stopped the conduct by reporting it and therefore he had control over Principal Cavanaugh.  Our

conclusion is further bolstered by the allegation that other staff were mandated reporters. Under Wadsworth's logic, any staff member who was required to report harassment was Principal Cavanaugh's "supervisor." That cannot be the case. Thus, Wadsworth has not established that the requirement to report misconduct necessarily results in control over the alleged bad actor.[15]

### b. Equal Protection

Next, Wadsworth challenges the district court's dismissal of her equal protection claim against Nguyen. As we have already explained, a standard equal protection claim such as this requires a plaintiff to establish "that '(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" Davis, 802 F.3d at 132-33 (quoting Rubinovitz, 60 F.3d at 910).

Below, the district court determined that Wadsworth had failed to allege a viable claim because she had not shown that

---

[15] To the extent Wadsworth argues that Nguyen had control over Cavanaugh because Nguyen stopped Principal Cavanaugh from taking Wadsworth to a doctor's appointment and advised him against having Wadsworth come live with him, we cannot consider these arguments as this claim arises from a motion to dismiss and the asserted facts are contained in the summary judgment record and not the operative complaint.

"Nguyen selectively treated [her] based on her sex, that [she] had putative comparators," or that "Nguyen acted with the purpose of discriminating on the basis of sex." The court explained that the complaint did not allege that Nguyen treated Wadsworth any differently from other students and did not even mention any other students that Nguyen had interacted with. Wadsworth now contends that because she is female and Medomak is a public school, a court can infer that Nguyen worked with male students and can further infer, considering the sex-based allegations at issue, that Nguyen would have treated a male student differently. Wadsworth's arguments are not persuasive.

In essence, Wadsworth is asking us to hold that an equal protection claim needs no supporting allegations. There are no allegations that would permit a court or jury to infer that Nguyen was motivated by an intent to discriminate against Wadsworth based on her sex or that he treated her any differently than he would another student. In fact, there are no allegations whatsoever relevant to Nguyen's motivation or to his interactions with any other students. Accordingly, we affirm the district court's dismissal of this claim.

**2. Motion for Summary Judgment: State-Created Danger**

Wadsworth next challenges the district court's grant of summary judgment in favor of Nguyen on her state-created-danger claim. A state-created-danger claim has four basic elements; a

plaintiff must establish that (1) "a state actor . . . affirmatively acted to create or enhance a danger to the plaintiff;" (2) "the act or acts created or enhanced a danger specific to the plaintiff and distinct from the danger to the general public;" (3) "the act or acts caused the plaintiff's harm;" and (4) "the state actor's conduct, when viewed in total, shocks the conscience." Irish, 979 F.3d at 75.

Nguyen's motion for summary judgment challenged only the first and fourth elements, so the district court confined its analysis to those two aspects of the claim. The district court determined that "[a] reasonable juror could conclude that by normalizing [Principal] Cavanaugh's behavior Mr. Nguyen plausibly increased [Principal] Cavanaugh's access to Ms. Wadsworth to continue sexually harassing her, and [thus] she has successfully established the affirmative action [requirement] of her state-created[-]danger theory." (Internal quotation marks and citation omitted). However, the court then determined that Wadsworth could not "clear the high bar of establishing that Mr. Nguyen's behavior shocked the conscience." In so concluding, the district court emphasized the lack of any allegation that "Nguyen had knowledge of the frequency or sexually explicit content of the text messages." The court went on to conclude that even if Wadsworth had established a constitutional violation, qualified immunity protected Nguyen.

Now, Wadsworth contends that the record contains evidence that would allow a juror to conclude that Nguyen had knowledge of the extent of Principal Cavanaugh's harassment and that qualified immunity could not protect Nguyen. Nguyen responds that Wadsworth has waived review. We agree.

First, Wadsworth has failed to address the crux of the district court's decision: Nguyen's knowledge (or lack thereof) of the extent and sexual nature of the text messages Principal Cavanaugh sent Wadsworth. Further, she provided no case law to support her position that Nguyen's conduct exceeds the high bar set by the "shocks the conscience" requirement. Moreover, in addressing qualified immunity, Wadsworth merely refers us to the section of her brief addressing the doctrine with respect to Cavanaugh. As Nguyen points out, the authorities cited therein are applicable to the alleged perpetrators of sexual harassment, not to encouraging bystanders, and as such do not address the question -- as framed by the district court -- of whether "Nguyen had fair notice that his particular conduct was unconstitutional." Accordingly, Wadsworth has waived review of the district court's decision granting Nguyen summary judgment on her state-created-danger claim. See Segrain, 118 F.4th at 71 ("[I]t is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." (quoting

United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990))); Montany v. Univ. of New England, 858 F.3d 34, 42 (1st Cir. 2017) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (quoting Zannino, 895 F.2d at 17)). Accordingly, we must affirm the district court's grant of summary judgment in favor of Nguyen on the state-created-danger claim.

## C. Claims Against MSAD

Finally, we address Wadsworth's appeal of the district court's grant of summary judgment in favor of MSAD on her § 1983 and Title IX claims. For the reasons that follow, we affirm the court's grant of summary judgment with respect to the § 1983 municipal liability claim but reverse the decision with respect to the Title IX claim.

### 1. Municipal Liability

Wadsworth's § 1983 claim against MSAD was premised on two different theories: (1) that MSAD failed to "follow, apply, or enforce laws preventing harassment and discrimination" ("insufficient policy claim") and (2) that MSAD failed to "train and supervise employees about their obligation to properly investigate and address incidents of sexual harassment in public

schools" ("failure to train claim").[16]   The district court determined that neither could proceed, and Wadsworth now appeals.

Before addressing the individual theories, we set forth the generally applicable principles.  "A municipality or other local government may be liable under [§ 1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." Connick v. Thompson, 563 U.S. 51, 60 (2011) (citing Monell v. N.Y. City Dep't of Soc. Servs., 436 U.S. 658, 692 (1978)).  Monell liability cannot be premised on vicarious liability but must be based on the governmental body's "own illegal acts."  Id. (emphasis omitted).  "[I]t is only when the governmental employees' 'execution of a government's policy or custom . . . inflicts the injury' and is the 'moving force' behind the constitutional violation that a municipality can be liable."  Young v. City of Providence ex rel. Napolitano, 404 F.3d 4, 25 (1st Cir. 2005) (omission in original) (quoting Monell, 436 U.S. at 694).  The two basic elements are whether Wadsworth's "harm was caused by a constitutional

---

[16] As with the supervisor-liability claim, the connection to equal protection is that Wadsworth alleges that Cavanaugh's conduct violated her equal protection rights.  The municipal-liability claim is then premised on the argument that MSAD should be liable for that violation.  See Abdisamad v. City of Lewiston, 960 F.3d 56, 60 (1st Cir. 2020) (explaining that municipal liability is method by which governmental entities are held responsible for policies or customs responsible for constitutional violations or injuries).

violation" and whether the governmental entity, here MSAD, can be held "responsible for that violation." Id. at 25-26.

A governmental entity cannot be held responsible unless "[an] action pursuant to official municipal policy caused their injury," Cosenza v. City of Worcester, 120 F.4th 30, 38 (1st Cir. 2024) (quoting Connick, 563 U.S. at 60), and "municipal decisionmakers either knew or should have known that training was inadequate but nonetheless exhibited deliberate indifference to the unconstitutional effects of those inadequacies," id. (quoting Haley v. City of Bos., 657 F.3d 39, 51 (1st Cir. 2011)).

And, of course, there must be an "underlying, identifiable constitutional violation[]." Bannon v. Godin, 99 F.4th 63, 88 (1st Cir. 2024) (quoting Lachance v. Town of Charlton, 990 F.3d 14, 31 (1st Cir. 2021)). Wadsworth advances the theory that the policies and training were unclear or lacking when it came to reporting instances of sexual harassment, particularly where the alleged harasser was the principal, thus causing the harassment to continue unchecked. See Plamp v. Mitchell Sch. Dist. No. 17-2, 565 F.3d 450, 459 (8th Cir. 2009) ("A school district can be liable for civil-rights violations under § 1983 either for failing to receive, investigate, and act upon complaints of [unconstitutional conduct] or for failing to train its employees to prevent or terminate [unconstitutional conduct]." (alterations in original) (quoting P.H. v. Sch. Dist. of Kansas City, 265 F.3d

- 58 -

653, 658 (8th Cir. 2001))). For the purposes of our review, we assume without deciding that this is a viable theory of liability.

## a. Insufficient Policy

Here, Wadsworth's theory is that MSAD deprived her of her rights by failing to follow, apply, or enforce policies preventing harassment and discrimination. In particular, she focuses on MSAD's policy on reporting sexual harassment, which she argues "contained a 'glaring hole' because," in her case, it led to a situation where "sexual harassment complaints could only be made to the harasser." We agree with the district court that the record does not reveal the existence of any gaps in the policy.

We begin by setting forth some additional relevant facts. While Wadsworth was a student at Medomak, MSAD had a written sexual harassment policy that included a procedure for reporting sexual harassment. Medomak employees were provided with copies of the policy. Among other things, the policy provides: "[a]ny individual who believes that a student has been discriminated against or harassed should report their concern promptly to the building principal and utilize [the] complaint procedure." The policy further provided that "[s]chool staff shall report possible incidents of discrimination or harassment of students to the building principal." The policy then directs the "building principal" to "promptly inform the Superintendent" and the subject of the complaint that a complaint exists. The policy

then outlines the possible next steps for the superintendent, or their "designee," to take. The policy itself does not define "building principal."

Superintendent Nolan testified at deposition that "building principal" referred to both the principal and the assistant principals. He further explained that if an assistant principal received a report, they would hand the report to the principal but "if there was a conflict" they would send the report directly to the superintendent. Assistant Principal Pease testified that, if the principal was the alleged harasser, she understood that she should report the harassment to either the superintendent or the superintendent's designee. Philbrook testified that, if the principal were the harasser, she would go to either the superintendent or the police.

In its motion for summary judgment, MSAD argued that there was no "hole" in the policy because "the record establishes that school employees were expected to and believed they were required to report" sexual harassment committed by the principal directly to the superintendent and that no employee made such a report about Principal Cavanaugh because "the conduct at issue did not appear . . . to be sexual harassment." It also argued that there was no causal link between the harassment policy and Wadsworth's alleged injuries.

The district court agreed with MSAD's assessment and determined that the record established that, "[i]n a case where the head principal was the perpetrator of the harassment, the policy d[id] not prevent reporting; instead students or staff could report harassment to an assistant principal" who could in turn "elevate reports of harassment to the [s]uperintendent." It also agreed that there was no indication in the record that any staff member or student believed that Principal Cavanaugh was sexually harassing Wadsworth.

On appeal, Wadsworth mounts no specific attack on the district court's reasoning or conclusion. And, after careful review of the record, we agree with the district court. First, the testimony establishes that although the policy was facially vague as to who the "building principal" was, it was understood that it referred to the principal as well as the assistant principals. Further, nothing in the record suggests that reports of Principal Cavanaugh's conduct did not reach the superintendent because staff assumed they could only pass the message to the abuser himself.[17] Nor does Wadsworth make any argument that if

---

[17] Nguyen testified that he understood that he could report sexual harassment either to "an affirmative action officer" within the superintendent's office (at the time, Cavanaugh) or to the Human Rights Commission. This testimony merely establishes that he understood that he had multiple options when it came to reporting harassment, undercutting Wadsworth's theory that staff understood they could only report Cavanaugh's abuse to Principal Cavanaugh himself.

such an assumption existed it was caused by a lack of training. Accordingly, we affirm the district court's grant of summary judgment on Wadsworth's insufficient policy claim.

### b. Failure to Train

We next turn to Wadsworth's theory that MSAD failed to provide any training on sexual harassment and how to report it. Wadsworth focuses on an alleged lack of training on how to report sexual harassment -- she does not contend that MSAD failed to provide training on how to identify sexual harassment. For reasons explained below, we conclude that her claim cannot survive.

Although the district court concluded that the record established that some training was provided and was not so inadequate as to show deliberate indifference, because there is some dispute between the parties as to whether MSAD provided any training or guidance,[18] we assume without deciding, in Wadsworth's favor, that the school provided no training on how to report sexual harassment. See Young, 404 F.3d at 28 (noting there were genuine issues of material fact regarding existence of training and assuming there was no training for the purposes of review). We

---

[18] MSAD contends that it "provided sexual harassment training to administrators and staff on a yearly basis." However, as Wadsworth points out, Nolan explained that Principal Cavanaugh provided this "training," while Cavanaugh testified that he was not qualified to provide any training on sexual harassment and merely presented a PowerPoint slideshow on the topic. Further, a copy of the presentation slides is not a part of the record.

then conclude that Wadsworth cannot establish that MSAD acted with deliberate indifference and, accordingly, affirm the district court.  See Caruso v. Delta Air Lines, Inc., 113 F.4th 56, 70 (1st Cir. 2024) (at summary judgment, we "may affirm 'on any ground supported by the record'" (quoting Burt v. Bd. of Tr. of Univ. of R.I., 84 F.4th 42, 54 (1st Cir. 2023))).

"Triggering municipal liability on a claim of failure to train requires a showing that municipal decisionmakers either knew or should have known that training was inadequate but nonetheless exhibited deliberate indifference to the unconstitutional effect of those inadequacies."  Cosenza, 120 F.4th at 38 (quoting Haley, 657 F.3d at 52).  Deliberate indifference requires a showing that MSAD disregarded a known or obvious risk of serious harm following from its failure to develop an adequate training program.  See Young, 404 F.3d at 28.  "Such knowledge can be imputed to a municipality through a pattern of prior constitutional violations."  Id.  Alternatively, in very rare cases, a pattern of violations may not be needed so long as the "'violation of [a] federal right[]' is 'a highly predictable consequence of a failure to equip [governmental actors] with specific tools to handle recurring situations.'"  Id. at 28 (first and second alterations in original) (quoting Brown, 520 U.S. at 409)).  Wadsworth cannot show deliberate indifference under either avenue.

- 63 -

The record contains no information regarding any pattern wherein MSAD school principals, or any other staff member, harassed a student and the harassment did not stop because staff did not know how to report the harassment. Wadsworth nevertheless suggests that no such pattern is needed in her case because this is the type of situation where the consequences of not training staff would have been obvious to MSAD. We disagree.

To begin, Wadsworth has failed to explain how these circumstances fit within the rare category where a plaintiff need not point to a pattern of prior violations. See Cosenza, 120 F.4th at 28 ("Typically, '[a] pattern of similar constitutional violations by untrained employees' is necessary to demonstrate deliberate indifference." (quoting Connick, 563 U.S. at 62)). Further, we are not aware of any case that supports Wadsworth's position. Indeed, there is nothing about this highly unusual situation that would suggest that failing to train school staff on how to report sexual harassment when the harasser is the principal would mean that no staff would report sexual harassment that they were aware of. Especially in light of the existing sexual harassment policy and reporting procedure, which were provided to staff, we cannot see how a failure to train employees "is so likely to result in a violation of constitutional rights that the need for training is patently obvious." Plamp, 565 F.3d at 462 (quoting Thelma D. v. Bd. of Educ. of City of St. Louis, 934 F.2d 929, 934

(8th Cir. 1991)) (concluding that in light of school policies on sexual harassment and reporting, failure to train merely "raise[d] a question about whether the program was negligently administered"). We do, however, echo the district court's admonition that whether MSAD's training program -- or lack thereof -- is a "best practice" is not currently before us. Thus, we also affirm the district court's grant of summary judgment to MSAD on Wadsworth's failure to train claim.

## 2. Title IX

Finally, we turn to the Title IX claim against MSAD and conclude that the court erred in granting MSAD summary judgment as to that claim.

"Title IX creates an implied private right of action against federal funding recipients for money damages caused by a recipient's violation of its obligations under the Title." Doe v. Pawtucket Sch. Dep't, 969 F.3d 1, 7 (1st Cir. 2020) (citations omitted). A Title IX "violation can occur when a Title IX funding recipient is deliberately indifferent to known acts of sexual harassment of a student by a teacher." Id. Liability is "predicated upon notice to an 'appropriate person.'" Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290 (1998) (citing 20 U.S.C. § 1682). As the Eleventh Circuit explained, the Gebser framework involves three inquiries: (1) did the plaintiff identify an "appropriate person" ("i.e., a school district official with

the authority to take corrective measures in response to actual notice of sexual harassment"), (2) was the substance of the actual notice "sufficient to alert the school official of the possibility of . . . harassment," and (3) did that official "exhibit deliberate indifference to the harassment." Doe v. Sch. Bd. of Broward Cnty., 604 F.3d 1248, 1254 (11th Cir. 2010); see Grace, 85 F.4th at 6, 11.

Below, the district court determined that Assistant Principals Pease and Philbrook were both appropriate persons to notify under Title IX. The district court went on, however, to determine that neither had notice of the harassment. Accordingly, the court granted MSAD summary judgment on the Title IX claim. On appeal, Wadsworth argues that the two assistant principals had notice. MSAD responds that the assistant principals were not appropriate persons and that, in any event, neither assistant principal had notice. We reject MSAD's arguments and agree with Wadsworth insofar as we conclude that a reasonable jury could find that the assistant principals had notice of the harassment. Accordingly, the district court erred in granting MSAD summary judgment on the Title IX claim.

As an initial matter, we reject MSAD's alternative grounds of affirmance that the assistant principals were not appropriate persons under Title IX. An appropriate person is an "official . . . with authority to take corrective action to end

the discrimination." Gebser, 524 U.S. at 288, 290. Whether an official has such authority is a factual inquiry that depends on the duties the school delegates to them. See Santiago v. Puerto Rico, 655 F.3d 61, 74 (1st Cir. 2011).

In determining that the assistant principals were appropriate persons under Title IX, the district court focused on their high rank as officials within the school and their authority to respond under the school's sexual harassment policy. MSAD cursorily argues that this was error, contending that because the assistant principals did not have disciplinary authority over Cavanaugh and because they merely had a duty to pass complaints on to the superintendent, they could not be appropriate persons. However, the district court expressly acknowledged that the assistant principals had no disciplinary power over Cavanaugh in reaching its conclusion. Furthermore, the assistant principals' roles under the sexual harassment policy were not confined to merely reporting complaints; their receipt of the complaint initiated the "complaint handling" procedure as they would alert both the superintendent and the person accused that a complaint had been received. Thus, we are not convinced that the court's decision was in error.[19]

---

[19] Wadsworth also argues that Nguyen was an appropriate person and had sufficient knowledge under Title IX. However, given our decision with respect to the assistant principals' knowledge, we need not consider this argument.

We next consider whether a reasonable jury could conclude that the assistant principals had notice. In deciding the issue, the district court applied a strict standard, explaining that "'actual knowledge' generally requires highly reliable and similar reports of inappropriate teacher behavior, meaning that 'rumors, investigations, and student statements' do not qualify." (Quoting Doe v. Bradshaw, 203 F. Supp. 3d 168, 185 (D. Mass. 2016)). We reject the district court's conclusion that "[w]hile the school perhaps ought to have known that Mr. Cavanaugh was behaving inappropriately . . . it cannot be said that the school actually knew of his harassment." As we explain below, it is enough if a reasonable jury could conclude that a school "ought to" know that harassment is occurring -- if MSAD had information that conveyed a substantial risk of ongoing harassment, that is enough regardless of whether the relevant school officials excused the conduct.

The inquiry as to whether Assistant Principals Pease and Philbrook had notice is an objective one. See Grace, 85 F.4th at 6, 11 (concluding that jury could find notice despite dean's view that conduct was not bullying); see also Doe v. Fairfax Cnty. Sch. Bd., 1 F.4th 257, 263, 268 (4th Cir. 2021) (notice test is objective). Further, Pease and Philbrook only needed notice that there was a substantial risk or "possibility" that harassment was occurring; in other words, the school did not need to have detailed

proof of harassment.  See Gebser, 524 U.S. at 291; see also Escue v. N. Okla. Coll., 450 F.3d 1146, 1154 (10th Cir. 2006) (school needed "actual knowledge of a substantial risk of abuse to students based on prior complaints by other students" (quoting Doe A. v. Green, 298 F. Supp. 2d 1025, 1033 (D. Nev. 2004))).  Finally, there does not need to be a singular report exposing the alleged harassment;  rather, notice is based on the totality of circumstances.  See Forth v. Laramie Cnty. Sch. Dist. No. 1, 85 F.4th 1044, 1055 (10th Cir. 2023).

Thus, construing the record in the light most favorable to Wadsworth, a reasonable jury could find that MSAD had actual knowledge at some point before Superintendent Nolan was alerted to the problem.  As the district court explained, and as MSAD now acknowledges, the assistant principals were aware of Cavanaugh's habit of pulling Wadsworth out of class, that he referred to her as "cupcake," that she was working for him to pay off the car he gave her, that he wanted to invite her to live with him, and that they communicated by text message (again, there is nothing in the record to suggest that they were aware of the content and extent of any of the messages).

Specifically, Wadsworth testified that Assistant Principal Philbrook was present for and participated in at least one conversation with Cavanaugh about how Wadsworth was "top shelf" and a pretty girl.  She also testified that Philbrook heard

Cavanaugh refer to Wadsworth as "cupcake" on at least one occasion and witnessed Cavanaugh hand Wadsworth an envelope of cash (presumably the money he gave her for prom). She further testified that Philbrook was present for at least part of a meeting Wadsworth had with Nguyen where she explained that Cavanaugh's various nicknames for her embarrassed her.

School Resource Officer Spear testified that on September 19, after pulling over Wadsworth, he discussed the situation with Assistant Principal Philbrook who explained that Cavanaugh "had asked [Wadsworth] if she was interested in moving in" with him. Philbrook explained that Cavanaugh had told her that when Cavanaugh asked his wife about Wadsworth moving in, his wife said "let me go get a 21-year[-]old boy to help me out if [Wadsworth's] going to be living in our house," further noting that "he's going to be jacked." Officer Spear also explained that Philbrook told him "I don't think anything sexual in nature has happened" but that "it certainly doesn't look good on the surface." According to Officer Spear, Philbrook explained that she thought Cavanaugh was "just being blinded by [Wadsworth's] good looks" and was "trying to look out for her" but was "crossing boundaries." Finally, Superintendent Nolan testified that Cavanaugh's conduct related to meeting Wadsworth during school hours and his providing her with a car, independently, created a cause for concern.

Taking everything together, a reasonable jury could conclude Assistant Principals Pease and/or Philbrook had information such that there was a substantial risk that Cavanaugh was sexually harassing Wadsworth. Thus, the district court erred in granting MSAD summary judgment on this basis, and we reverse the district court's decision as to the Title IX claim and remand for further proceedings consistent with this opinion.

## IV. Conclusion

For the forgoing reasons, we **affirm in part** and **reverse in part** the district court's grant of summary judgment in favor of Cavanaugh, **affirm** the district court's order dismissing the supervisor-liability claim against Nguyen, **affirm** the court's grant of summary judgment in favor of Nguyen, **affirm in part** and **reverse in part** the district court's grant of summary judgment in favor of MSAD, and **remand** for further proceedings consistent with this opinion. Costs are awarded to Wadsworth.

**-Concurring Opinion Follows-**

**RIKELMAN, Circuit Judge, concurring.** I join the court's thorough opinion today. I write separately to explain my view of the correct framework for analyzing a federal equal protection claim based on sexual harassment.

First, as I understand current jurisprudence, comparator evidence is not always required to bring an equal protection claim, regardless of whether the claim involves sexual harassment or a different type of illegal discrimination. Decades ago, the Supreme Court held that to succeed on an equal protection claim under the Fourteenth Amendment, a plaintiff must convince a court that the government acted with discriminatory animus or purpose. See Washington v. Davis, 426 U.S. 229, 242 (1976) (holding disparate impact "[s]tanding alone" is not constitutionally actionable in context of race discrimination claim); Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 274-76 (1979) (same for sex discrimination). But the Supreme Court has never held that comparator evidence -- proof that the government treated similarly situated individuals differently -- is always necessary to demonstrate discriminatory purpose. Instead, evidence that similarly situated individuals received preferential treatment as compared to the plaintiff is just one way to prove intentional discrimination. See, e.g., Davis, 426 U.S. at 242 (discriminatory purpose should be "inferred from the totality of the relevant facts"); Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266

(1977) ("Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."); cf. Fincher v. Town of Brookline, 26 F.4th 479, 486 (1st Cir. 2022) (comparator evidence is relevant "at least in the absence of direct proof" of discriminatory animus).

Indeed, the Supreme Court has repeatedly recognized, in a variety of legal contexts, that a plaintiff can prove intentional discrimination with various forms of evidence. See, e.g., Arlington Heights, 429 U.S. at 267-68 (explaining, in equal protection case challenging government policy, that "historical background of the decision," "specific sequence of events leading up to the challenged decision," "[d]epartures from the normal procedural sequence," and "legislative or administrative history" may all be evidence of discriminatory purpose); Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000) (holding, in Age Discrimination in Employment Act context, that "one form of circumstantial evidence that is probative of intentional discrimination, and . . . may be quite persuasive" is evidence that employer's proffered explanation for adverse employment action is false); Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 339 (1977) (explaining, in Title VII case, that "[w]e have repeatedly approved the use of statistical proof . . . to establish a prima facie case of racial discrimination"); cf. EEOC

v. Abercrombie & Fitch Stores, Inc., 575 U.S. 768, 770, 775 (2015) (employee could bring Title VII religious discrimination claim without comparator evidence by showing that employer knew employee wore a headscarf for religious purposes and refused to hire her because of the headscarf).  We have followed suit.  See, e.g., Ripoli v. Dep't of Hum. Servs., Off. of Veterans Servs., 123 F.4th 565, 577-78 (1st Cir. 2024) (concluding, in Title VII case, that plaintiff had created genuine issue of material fact about discriminatory purpose, even before looking to her comparator evidence).

Our sister circuits agree that comparator evidence is not necessary for all equal protection claims.[20]  As the Ninth

---

[20] That said, appellate courts, including our court, have consistently required comparator evidence for two types of equal protection claims: selective enforcement and class-of-one claims. See, e.g., Rubinovitz v. Rogato, 60 F.3d 906, 909-10 (1st Cir. 1995) (selective enforcement/class-of-one case concerning local zoning and building code regulations); Frederick Douglass Found., Inc. v. District of Columbia, 82 F.4th 1122, 1137 (D.C. Cir. 2023) (selective enforcement case).  Given that government officials may legally exercise discretion in deciding when to bring enforcement actions, "[s]elective enforcement claims must clear a high hurdle."  Frederick Douglass Found., 82 F.4th at 1140.  Further, in such cases, the government's conduct toward the plaintiff may not evince any potentially discriminatory motive.  See Rubinovitz, 60 F.3d at 908-09, 911.  Thus, the plaintiff must rely on evidence that, "compared with others similarly situated," they were targeted for enforcement based on impermissible considerations. Id. at 909-10.  So too, in class-of-one cases where the plaintiff alleges that they were singled out for unfavorable treatment based on their own unique -- and unprotected -- characteristic, "proof of a similarly situated, but differently treated, comparator is essential."  Snyder v. Gaudet, 756 F.3d 30, 34 (1st. Cir. 2014); see also, e.g., Vill. of Willowbrook v. Olech, 528 U.S. 562, 564

Circuit has explained, "a relevant comparator is not an <u>element</u> of a disparate treatment claim" under the Equal Protection Clause (or anti-discrimination statutes); rather, it is merely one type of evidence that can be used to prove discriminatory purpose. <u>Ballou</u> v. <u>McElvain</u>, 29 F.4th 413, 424 (9th Cir. 2022) (rejecting need for comparator evidence in non-sexual-harassment gender discrimination case concerning failure to promote). Were there such a "relevant comparator" requirement, the Ninth Circuit reasoned, even direct evidence of discrimination (e.g., an employer's statement that he would never promote a woman) "would not support a disparate treatment claim unless [the employer] promoted an identical male comparator." <u>Id.</u> at 426. The court concluded that this result would be "contrary to the [Fourteenth] [A]mendment's fundamental guarantee of 'equal protection of the laws.'" <u>Id.</u> at 425 (quoting U.S. Const. amend. XIV, § 1).

The Second Circuit has likewise held that a plaintiff bringing a race discrimination claim under the Equal Protection Clause "need not plead or show the disparate treatment of other similarly situated individuals." <u>Pyke</u> v. <u>Cuomo</u>, 258 F.3d 107, 109 (2d Cir. 2001). <u>Pyke</u> involved a claim that police had withheld

_____

(2000) (per curiam) (plaintiffs stated class-of-one claim by alleging different treatment from similarly situated property owners); <u>Buchanan</u> v. <u>Maine</u>, 469 F.3d 158, 177-78 (1st Cir. 2006) (requiring evidence of similarly situated comparator where plaintiff alleged that, unlike other "high-risk patients," he did not receive an individualized support plan).

protection from the plaintiffs because they were Native American. Id. at 108. The district court granted summary judgment to the police on the ground that the plaintiffs had failed to come forward with comparator evidence, but the Second Circuit reversed, explaining that such evidence was not required. See id. at 108-09. It noted that "[i]t would be difficult, if not impossible, to find other individuals whose situation is similar to Native Americans living on a reservation," and that impossibility should not doom the plaintiffs' case. Id. at 109; see also Lewis v. City of Union City, 934 F.3d 1169, 1185 (11th Cir. 2019) (collapsing analysis for Title VII and equal protection claims, then concluding it was "perfectly logical" not to require comparator evidence in race and gender discrimination cases, because "[a]mong other things, a proper comparator simply may not exist"). The Second Circuit cautioned that a contrary rule would allow the police to escape liability even if they had denied protection to the plaintiffs based on discriminatory animus against Native Americans, which was "clearly not the law." Pyke, 258 F.3d at 109. The court concluded by reiterating that "a plaintiff seeking to establish a violation of equal protection . . . may proceed in 'several ways'" to prove intentional discrimination. Id. at 110.

In my view, we should clarify that comparator evidence is not required for every equal protection claim. To the extent some of our precedent suggests otherwise, it appears to be

inconsistent with Supreme Court case law and relies on analysis designed for a narrow subset of equal protection claims: selective enforcement and class-of-one claims.[21]

Second, regardless of whether comparator evidence is necessary for other equal protection claims, I agree with the court's holding that comparator evidence should not be required for equal protection claims based on sexual harassment. As today's opinion lays out and other courts have cogently explained, a government official like Cavanaugh who engages in sexual harassment has necessarily committed intentional discrimination. Such intentional, discriminatory conduct is actionable under the Equal Protection Clause.

For example, the Tenth Circuit has expressly disavowed the need for comparator evidence to support an equal protection

---

[21] For instance, in a case in which a gay man brought a claim that he was "singled out for transfer because of his sexual orientation," we cited both Rubinovitz and Buchanan in requiring him to provide evidence that "heterosexual employees with similar rank and qualifications" were treated differently, even though his claim was not a selective enforcement or class-of-one claim. Ayala-Sepúlveda v. Municipality of San Germán, 671 F.3d 24, 29, 32 (1st Cir. 2012). And when a Black firefighter sued various local entities and officials for race discrimination, we again relied on Rubinovitz to impose a comparator evidence requirement; we also cited an older case for the same proposition. Alston v. Town of Brookline, 997 F.3d 23, 41 (1st Cir. 2021)(citing Dartmouth Rev. v. Dartmouth Coll., 889 F.2d 13, 19 (1st Cir. 1989)). But Dartmouth reiterates that "treatment toward others similarly situated can be used to demonstrate intent" -- not that such evidence is always necessary. 889 F.2d at 19 (emphasis added) (citing Arlington Heights, 429 U.S. at 266).

claim based on sexual harassment, holding that a plaintiff who brings such a claim "ha[s] no requirement to show she was treated differently from a similarly situated individual." Eisenhour v. Weber Cnty., 744 F.3d 1220, 1234 (10th Cir. 2014). In Eisenhour, a county court administrator presented evidence that her direct supervisor, a judge, "wrote an inappropriate poem about her, told her that he had a dream about her in which she was naked, and rubbed his groin against her," which the court concluded was sufficient for a jury to "infer that she had been discriminated against because of her sex," even in the absence of evidence about how the judge treated other employees. Id. at 1234-35.

Likewise, the Seventh Circuit determined that a police officer could be liable under the Equal Protection Clause for his sexual harassment of a high school student during a "ride-along," regardless of the existence of comparator evidence. Hess v. Garcia, 72 F.4th 753, 760-61 (7th Cir. 2023). The court concluded that the student needed to show only that the officer "discriminated against her based on her membership in a definable class." Id. at 761 (cleaned up). And the student's evidence of the officer's overtly sexual comments and conduct, which "clearly suggest[ed] harassment by [a] public official[] that ha[d] no conceivable legitimate purpose," was sufficient to state an equal protection claim. Id. (quoting Geinosky v. City of Chicago, 675 F.3d 743, 748 (7th Cir. 2012)).

Similarly, the Ninth Circuit, without reference to comparator evidence, has broadly concluded that "[s]exual harassment violates the Equal Protection Clause because, by definition, it is 'motivated by gender.'" Sampson v. Cnty. of L.A. ex rel. L.A. Cnty. Dep't of Child. & Fam. Servs., 974 F.3d 1012, 1023 (9th Cir. 2020) (citation omitted). Sampson concerned allegations of sexual harassment against a state social worker assigned to evaluate the plaintiff as a potential legal guardian for her niece. See id. at 1023-24. In its analysis, the Ninth Circuit focused on the nature of the discriminatory act. It wrote: "Simply put, if she were a man, Sampson would not have experienced this harassment . . . and that discrepancy fundamentally offends the equality and fairness principles embodied in the Equal Protection Clause." Id. at 1024.

Third, I see no basis in equal protection jurisprudence for applying a "severe, pervasive, and objectively offensive" standard to allegations of sexual harassment by a government official. I appreciate and agree that it is often helpful to look to Title IX (and Title VII) case law in evaluating claims under the Equal Protection Clause, but the statutory and constitutional claims are different in important respects that impact the legal analysis.

To point out just a few distinctions, the relevant text of Title IX differs substantially from the text of the Equal

Protection Clause. Compare Title IX, 29 U.S.C. § 1681(a) ("No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . .") with U.S. Const. amend. XIV, § 1 ("No state shall . . . deny to any person within its jurisdiction the equal protection of the laws."). Further, Congress enacted Title IX in 1972, when modern equal protection jurisprudence did not yet exist, to address discrimination in educational programs in particular. See Craig v. Boren, 429 U.S. 190, 197 (1976) (establishing, for the first time, that sex-based classifications are subject to intermediate scrutiny).

Analyzing some of these differences, the Supreme Court has noted that, as compared to the Equal Protection Clause, "Title IX's protections are narrower in some respects and broader in others." Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246, 256 (2009). Title IX covers both private and public educational institutions that receive federal funds whereas the Equal Protection Clause applies only to government actors. See id. at 257. At the same time, a plaintiff can bring a damages claims under Title IX only against institutions or programs, not individuals. See id. By contrast, a plaintiff who brings an equal protection claim can directly sue the public official who engaged in the discriminatory conduct. See id.

Further, "the standards for establishing liability [under Title IX and the Equal Protection Clause] may not be wholly congruent." Id. Given that the implied private right of action under Title IX does not permit suits against individuals for damages, see id. at 256-57, a plaintiff bringing a Title IX sexual harassment claim must show that the institution or program itself, as opposed to someone affiliated with it, engaged in discrimination. Thus, an educational institution is liable under Title IX for sexual harassment if the plaintiff can establish that an official with the authority to take corrective action was "deliberate[ly] indifferen[t]" to such harassment. Id. at 257; cf. Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 292-93 (1998) ("[A]n individual may have [a claim] against . . . the teacher in his individual capacity . . . under 42 U.S.C. § 1983" even if the school district is not subject to Title IX liability for that teacher's conduct.).

The Supreme Court discussed many of the unique aspects of proving sexual harassment claims under Title IX in Davis ex rel. LaShonda D. v. Monroe County Board of Education, a case that concerned allegations of student-on-student harassment. 526 U.S. 629, 639 (1999). As the Court explained, sexual harassment qualifies as discrimination under Title IX. See id. at 649-50. But "a recipient of federal funds may be liable in damages under Title IX only for its own misconduct." Id. at 640 (emphasis

added).  Further, because Title IX was "enacted pursuant to Congress'[s] authority under the Spending Clause, . . . private damages actions are available only where recipients of federal funding had adequate notice that they could be liable for the conduct at issue."  Id.  And, the text of Title IX "cabins the range of misconduct that the statute proscribes.  The statute's plain language confines the scope of prohibited conduct based on the recipient's degree of control over the harasser and the environment in which the harassment occurs."  Id. at 644-45 (focusing on term "subjected" to discrimination and phrase "under any education program or activity" in Title IX's text).  Because the discrimination must "occur 'under any education program or activity,'" the "behavior [should] be serious enough to have the systemic effect of denying the victim equal access to [that] educational program or activity."  Id. at 652.  Putting all these key aspects of establishing liability under Title IX together "in the context of student-on-student harassment," id., the Court held that:

> [F]unding recipients are properly held liable in damages only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school.

Id. at 650.

As this examination of Davis makes clear, the "severe, pervasive, and objectively offensive" standard set out in that case was premised on the requirements of establishing liability for student-on-student sexual harassment in the unique context of Title IX.[22] Davis itself recognizes that less severe conduct may be actionable where the alleged harasser is a teacher or principal (i.e., a government official), like Cavanaugh, who is in a position of authority over the plaintiff. See 526 U.S. at 653 ("The relationship between the harasser and the victim necessarily affects the extent to which the misconduct can be said to breach Title IX's guarantee of equal access to educational benefits and to have a systemic effect on a program or activity."); see also Doe v. Pawtucket Sch. Dep't, 969 F.3d 1, 11 (1st Cir. 2020) ("Conduct that might not be actionable under Title IX if perpetrated by a student might be deemed more likely to exclude, or discriminate against, the potential targets of the conduct if

---

[22] Similarly, to be actionable under Title VII, sexual harassment must be severe enough to demonstrably affect the plaintiff's employment. See Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) ("[T]o ensure that Title VII does not become a 'general civility code' . . . . [w]e have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment. . . ."). That is because a discrimination claim under Section 703 of Title VII must be related "to [the plaintiff's] compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1). The Supreme Court adopted the "severe or pervasive" standard under Title VII to evaluate whether alleged sexual harassment has such an impact. Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986).

perpetrated by a person in authority.").[23]  As the Supreme Court stated in another Title IX case, "[n]o one questions that a student suffers extraordinary harm when subjected to sexual harassment and abuse by a teacher."  Gebser, 524 U.S. at 292.

Even putting aside the specific facts in Davis, there is no obvious reason to import all the requirements for Title IX liability, which are tied to the statute's text and its enactment under Congress's spending power, into the test for establishing sex discrimination under the Equal Protection Clause.  Title IX's unique features, including the unavailability of damages against individuals and the requirement that an educational institution or program have sufficient notice of its potential liability for Spending Clause purposes, do not exist for claims against a government official under the Equal Protection Clause.

Just as importantly, Equal Protection Clause jurisprudence does not demand that a plaintiff establish that

---

[23] In fact, some of our sister circuits have expressly interpreted Davis to apply the "severe, pervasive, and objectively offensive" standard only in Title IX cases of student-on-student harassment, but not teacher-on-student harassment.  See, e.g., Wamer v. Univ. of Toledo, 27 F.4th 461, 469-70 (6th Cir. 2022); Sauls v. Pierce Cnty. Sch. Dist., 399 F.3d 1279, 1284 (11th Cir. 2005).  As the Sixth Circuit explained, applying a lower standard to teacher-on-student harassment comports with the text and purpose of Title IX: "When a teacher sexually harasses a student, it can more easily be presumed that the harassment would 'undermine and detract from the student's educational experience' because teachers are at the core of a student's access to and experience of education."  Wamer, 27 F.4th at 471 (cleaned up).

discrimination was "severe, pervasive, and objectively offensive" to be actionable. The Equal Protection Clause requires only proof of actual harm and intentional discrimination for a claim to proceed. See, e.g., Arlington Heights, 429 U.S. at 264-65; Heckler v. Mathews, 465 U.S. 728, 738-39 (1984).

Intentional discrimination -- which includes sex discrimination by a government official -- violates the Equal Protection Clause if it "does not 'serve important governmental objectives.'" Lipsett v. Univ. of P.R., 864 F.2d 881, 896 (1st Cir. 1988) (quoting Davis v. Passman, 442 U.S. 228, 234-35 (1979)); see Catherine A. MacKinnon, Sexual Harassment of Working Women 102 (1979) (explaining that unlike Title VII claim, equal protection claim requires interrogating the "state's purpose in using, and its use of, sex as a criterion"). As the Seventh Circuit has persuasively explained, sexual harassment never serves an important governmental objective. See Hess, 72 F.4th at 761. It follows that the relevant question for equal protection analysis is whether the government official's conduct rises to the level of sexual harassment -- not whether that harassment is "severe, pervasive, and objectively offensive."[24]

_____

[24] These inquiries are related but distinct, as decisions applying the analogous Title VII standard demonstrate. See, e.g., Lipsett, 864 F.2d at 897-98 ("[N]ot all conduct that may be characterized as 'harassment' . . . [is] 'sufficiently severe or pervasive to create an abusive working environment.'"(cleaned up)); Gallagher v. C.H. Robinson Worldwide, Inc., 567 F.3d 263,

Thus, although there is no question that a jury could find that Wadsworth was subjected to harassment that was severe, pervasive, and objectively offensive, the Equal Protection Clause does not require her to prove that level of harm.

---

271 (6th Cir. 2009) (explaining conduct was harassment "based on sex" where it was "explicitly sexual and patently degrading of women," and "[t]he natural effect of exposure to such offensive conduct is embarrassment, humiliation and degradation"); Howley v. Town of Stratford, 217 F.3d 141, 154-56 (2d Cir. 2000) (analyzing separately whether employer's use of degrading and sexualized language affected workplace from whether same conduct constituted sexual harassment).